TRUSSELL v. SCARLETT, trading as R. G. DUN & CO.

*(Circuit Court, D. Maryland. November Term, 1882.)*

1. EVIDENCE—PRIVILEGED COMMUNICATION.

When objection is made to the admissibility of a paper offered in evidence, upon the ground that it is a privileged communication, it is proper for the court, before permitting said paper to be read to the jury, to allow the party objecting to cross-examine the witness producing it, and also to receive other evidence upon the question of its privileged character, in order to decide as to its admissibility.

2. SAME—LIBEL—MERCANTILE AGENCY.

When a mercantile agency makes a communication to one of its subscribers who has an interest in knowing it, concerning the financial condition of another person, and when such communication is made in good faith, and under circumstances of reasonable caution as to its being confidential, it is a protected privileged communication, and an action for libel cannot be founded upon it, even though the information given thereby was not true in fact, and though the words themselves are libelous.

This was an action for libel, tried December 5, 1882, in the circuit court of the United States for the district of Maryland, before Hon. THOMAS J. MORRIS, district judge, and a jury.

The declaration alleged that the plaintiff was a general merchant, conducting a wholesale and retail business at Charlestown, West Virginia, etc., and that the defendants, together with Robert G. Dun, being then engaged in carrying on the business known as a mercantile agency in the principal cities of the United States, etc., under the style of R. G. Dun & Co., on the eleventh day of July, 1881, at the city of Baltimore, wrongfully, injuriously, and maliciously composed and published, etc., a certain false, scandalous, malicious, and defamatory libel of and concerning the plaintiff, and of and concerning him, in his said business, etc., containing the words following; that is to say: "Trussell, C. W., Charlestown, Jefferson Co., W. Va., D. G., etc., July 11, '81, has made an assignment for the benefit of his creditors. No particulars known as yet;"—thereby meaning that the plaintiff had utterly failed in his said business and was unable to carry on the same, and to pay his just debts in their usual and regular course, and was insolvent. The declaration alleged special damage, and claimed $10,000 damages. Plea, not guilty.

The plaintiff, after proving that on June 11, 1881, he was engaged in business as alleged in the declaration, and had good credit, called as a witness William Devries, who testified that about June 11, 1881, he received from the defendants' office in Baltimore a paper, of which he produced a copy, (the original having been destroyed,) and that such papers, inclosed in an envelope, were usually delivered at witness' office by a boy in the employ of defendant, who took a receipt for them. The plaintiff then offered said paper in evidence, but the defendants' counsel contended that before it could be read to the jury they had a right to cross-examine the witness in order to show that it was a privileged communication and therefore inadmissible; citing *Maurice* v. *Worden,* 54 Md. 251, in which it was held that where the plaintiff offered in evidence a paper, to the introduction of which the defendant made objection upon the ground that it was a privileged communication, the court properly received evidence to show its privileged character before permitting it to be read.

*Marshall & West,* for plaintiff.

*Wm. Reynolds, C. J. Bonaparte,* and *Saml. Wagner,* for defendants.

MORRIS, J. It does seem to me a very much better way of conducting the trial that it should be ascertained first whether there is any ground for the action, otherwise, if it should turn out that the paper offered in evidence was a privileged communication, we may get into a very long controversy, which may be obviated at this stage of the proceedings.

The witness then, upon cross-examination by the defendant, further testified that the firm of William Devries & Co., of which he was a partner, was, at the time of receiving said paper, and had been for a number of years before, a subscriber to the mercantile agency of the defendants; that when they first credited plaintiff, which was probably soon after the close of the war, they made an inquiry of R. G. Dun & Co.; that they were apt to make one twice a year,—every six months,—may have made half a dozen during the year; that this paper, or a similar one, came to their office giving this information. Witness, upon being shown a ticket addressed to R. G. Dun & Co., asking information in regard to plaintiff, and dated June 16, 1881, identified it as having come from his office, and upon being asked whether the paper received by him was not in answer to the inquiry contained in said ticket, replied:

"I don't know. I should infer it was. We make inquiries every day in the week. We have an understanding with R. G. Dun & Co. that if anything occurs to any of our customers they are to immediately inform us."

(The defendants' counsel then asked the court to exclude the paper offered in evidence by the plaintiff, and the question was fully argued.)

*Morris, J.* If a merchant having an interest in knowing the financial standing of another merchant, whom he proposes to deal with, goes to another, and asks him with regard to that person's financial standing, and he honestly answers him what he knows about

the person inquired of, even if it should turn out to be false, I think it is a privileged communication, upon which an action cannot be founded, even though the words themselves are libelous. If he says, "I have looked into his affairs, I have informed myself with regard to them for my own benefit, and I believe him to be insolvent," I do not think that such a communication, if made in good faith, is one upon which an action can be founded. The doctrine of the case of *White* v. *Nichols*, 3 How. 266, it seems to me, has been again and again held to cover communications made between merchants with regard to the standing of traders, where the party making the inquiry had an interest, and where the party answering the inquiry answered it in good faith. It is conceded in this case that the plaintiff cannot show any want of good faith, and the only question that remains open is whether that doctrine is applicable to a person in the situation of the defendant in this case. It was held in *Beardsley* v. *Tappan*, 5 Blatchf. 497, that it was not. That was a case decided some years ago, at a time when companies or corporations, formed for the purpose of collecting information for the benefit of merchants, were very little known. It has never been sanctioned in any higher court; the contrary has been decided in the highest courts of New York and other states, and the contrary was also held in a well-considered opinion by Judge CALDWELL, in the circuit court of the United States for the eastern district of Arkansas, (*Erber* v. *Dun*, 12 FED. REP. 526,) covering the facts of this case. If it is permissible for one merchant to inquire of another for his own benefit as to the standing of another merchant, I cannot see how any distinction can be made where one expends money and another receives money for the information, and makes it his business to get the information. The only question, then, is, was this communication, which is offered in evidence here, and which I hold to be a privileged communication, made to William Devries & Co. under circumstances which keep it within the protection of privileged communications; that is, was it made under circumstances of reasonable caution as to its being confidential? It appears from the evidence that it was intended to be a confidential communication; that the agreement and contract between the defendant and Devries & Co. was that it was to be kept to themselves and not disclosed to others; and that it was made to them because they had an interest in knowing the financial situation of the plaintiff. It is, in my opinion, a protected privileged communication, and I therefore exclude the evidence.

The plaintiff took a nonsuit.

---

The first point made in the case before us is in harmony with many rulings on the subject of admissibility. When the admissibility of either a witness or a document is in question, the party opposing the admissibility is entitled, as a preliminary test, to cross-examine on this specific issue the witnesses on

whose testimony the admissibility depends. No document or witness, such is the fundamental principle, is self-proving. We must fall back, as a basis logically necessary in all cases, on parol proof; and this proof only is effective when exposed to the criticism of cross-examination. This is illustrated by the old practice of examination on *voir dire.* When a witness, in old times, as to whose competency there was any question, was called, he was sworn, not to "tell the truth, the whole truth, and nothing but the truth," but "true answers to make to such questions as should be put to him." These questions related solely to his competency; and the burden of this preliminary examination fell upon the party objecting to competency. In fact, the old practice was, when there was an objection to competency, for the objecting counsel to ask for the administering of the *voir dire* oath, which was granted as a matter of course. The objecting counsel then proceeded to inquire as to the witness' interest in the case, or other ground of incompetency; the party sustaining the admissibility being then entitled to examine in reply.[1] The same distinction is taken with regard to the proof of lost documents. A witness called to prove the contents of a lost document, after his examination by the party calling him on the subject of the loss, and of his knowledge of the document, is open to cross-examination by the opposing counsel; and it is not until the witness has been thus fully probed, and his knowledge on this specific issue drawn out, that the document is received in evidence.[2] If it should appear, upon cross-examination, that the witness was not the custodian of the paper, or was not personally familiar with the fact or nature of its custody, this is decisive against admissibility, unless witnesses who can prove such custody, and can in this way account for the loss of the paper, are produced.[3] So is it when a witness declines to answer on the ground of self-crimination. This is a prerogative which is almost always set up on cross-examination; but at whatever stage of a case a witness declines to answer on this ground, after he states his objection, counsel on both sides are entitled to examine him as to the extent to which the objection is interposed.[4] The examination must show, to the satisfaction of the court, that the danger to which the witness would be exposed by answering is real and substantial, or else the witness will be compelled to answer.[5] The same line is taken when other phases of privilege are set up by a witness. This is the case where an attorney sets up professional privilege;[6] where a particular fact sought to be proved is alleged to have been the subject-matter of a confidential communication between a party to a suit and his witnesses;[7] where arbitrators or jurors are examined as to the grounds of their award or finding;[8] and where public officers are asked as to state secrets.[9] Hence the ruling in the case in the text is in conformity with the analogies in kindred cases of privilege.

The point as to the liability of mercantile agencies for libel in case of an

---

[1] R. v. Gisburn, 15 East, 57; Quarterman v. Cox. 8 C. &. P. 97; Brockbank v. Anderson, 7 M. & Gr. 295; Fifield v. Smith, 21 Mc. 383; Walker v. Sawyer, 13 N. H. 191; Bridge v. Wellington, 1 Mass. 219; Foley v. Mason. 6 Md. 37; Wright v. Mathews, 2 Blackf. 187; Herndon v. Givens, 16 Ala. 261.

[2] See Fisher v. Samuda, 1 Camp. 193; Clark v. Houghton, 12 Gray, 38; Richardson v. Robbins, 124 Mass. 105; Coxe v. England, 65 Pa. St. 212; Rankin v. Crowe, 19 Ill. 626.

[3] Hart v. Hart, 1 Hare. 1; R. v. Piddlehinton, 3 B. & Ad. 460; R. v. Hinckley, 3 B. & S. 885; Richards v. Lewis, 11 C. B. 1035; Plaxton v. Dare, 10 B. & C. 17.

[4] See Cates v. Hardacre, 3 Taunt. 424; Chestler v. Wortley, 7 C. B. 410; Schofield, Ex parte, L. R.

[6] Ch. D. 230; Low v. Mitchell, 18 Me. 372; Coburn v. Odell, 30 N. H. 340; Brown v. Brown, 5 Mass. 320; People v. Kelly, 24 N. Y. 74.

[5] Osborn v. Dock Co. 10 Exch. 698; Fernandez, Ex parte, 10 C. B. (N.S.) 329; Grannis v. Brandon, 5 Day. 260; People v. Mather, 4 Wend. 229; Ward v. State, 2 Mo. 98; Floyd v. State, 7 Tex. 215.

[6] See Greenough v. Gaskell, 1 M. & R. 98.

[7] Ross v. Gibbs, L. R. 8 Eq. 522; Hamilton v. Nott, L. R. 16 Eq. 112.

[8] Johnson v. Durant, 4 C & P. 327; Buccleugh v. Board of Works, L. R. 3 Ex. 306; R. v. Rosser, 7 C. & P. 648; Howser v. Com. 51 Pa. St. 332.

[9] Plunkett v. Cobbett, 5 Esp. 136; Chubb v. Salomons, 3 C. & K. 75; Hartranft's App. 85 Pa. St. 433.

honest, though erroneous, expression of opinion, is one of more novelty. There is no question of the benefit to business of mercantile agencies, and especially of that which was the defendant in the case in the text. The duties of these agencies, it has been several times laid down, is not that of insuring the intelligence communicated, but of giving conscientious care and diligence to the collection of intelligence, and then communicating it to customers accurately as received. "The general rule," said FORCE, J.,[1] "is that special agents are bound to the diligence of good business men in the particular specialty. The testimony shows that, according to the practice of all mercantile agencies in the United States, such inquiry (an inquiry as to recorded incumbrances on title) is never undertaken, such information is never given, unless specially asked for, and in such case the cost of making such inquiry is paid in addition to the usual fees." In McLean v. Dun, before the Canada court of appeals in 1876,[2] we have the following expressions of opinion on the same point: "If a man," said HAGARTY, C. J., "hire another for the express purpose of obtaining information as to the standing and credit of certain-named persons, the individual employed would certainly be bound to reasonable diligence in doing the work. If he report to his employer without having made due inquiries, I think his liability rests wholly on his breach of contract, and his breach of duty is the proximate cause of damage resulting from his carelessness." By PATTERSON, J., the mode of doing business by the defendants, who were the same as in the present suit, is thus stated: "I do not think the contract provides for, or contemplates the making of, special inquiries on application concerning particular customers. No doubt that might be done, and it might be necessary to do it, if the application referred to some one concerning whom there is no recorded report. But looking at the contract only, it seems to have in view that the results of general inquiries are to be kept on record, and to be communicated on application. From those extended reports the reference-book is compiled, and it is furnished to every subscriber. I do not think the contract extends further than this." In Sprague v. Dun, in the Philadelphia common pleas, in 1876,[3] we have an opinion by Judge HARE to the same general effect: "When the plaintiff paid his subscription he signed a printed document containing inter alia the following words: 'The said R. G. Dun & Co. shall prepare for our use, and place in our keeping, a printed copy of a reference-book prepared by them, containing ratings or markings of the credit of business men, and all our inquiries at their office, as also all use made of such reference-book, shall be exclusively confined to the legitimate business of our establishment.' The defendants requested me to charge the jury that the plaintiff was bound by his contract with the defendants to confine his inquiries to the legitimate business of his establishment; and if the jury believed that the plaintiff, being a druggist, used the information for other than his legitimate business, such as the floating of commercial paper, he violated his contract, and the defendants are not bound by it. This point obviously involves two propositions,—one, that the defendants are not liable under the contract for any use which the plaintiff might make of the information furnished by them outside of the legitimate course of his business; the other, that the plaintiff's indorsements for Getz (the party inquired about) were not within his legitimate business as a druggist, and could not be a ground of recovery in this suit. The inclination of my mind is that the defendant was entitled to an affirmative answer under both these heads."

From these judicial statements of the object and limitations of mercantile agencies it appears that their value is largely dependent on their confidential relations as agents for inquiring and reporting as to the character of business

---

[1] Gibson v. Dun, Court C. P. Hamilton Co., Ohio, 1876, pamphlet report.

[2] Pamphlet report.

[3] Pamphlet report.

men with whom customers of the agencies are likely to deal. The utility of agencies of this class is very great. To take a much more limited field for illustration, no one can question either the utility or the confidential nature of intelligence offices for the collecting and communicating information as to the character of domestic servants. Neither the employer nor the employe can well dispense with such agencies; and that they are regarded by the law as privileged on the ground of confidence, supposing there be no malice, will be hereafter seen. There is little doubt that intelligence offices are of great benefit, both to masters seeking servants and to servants seeking masters. A servant, especially a stranger, coming to a community with whose ways he is unacquainted, often finds such an agency essential to the procuring of employment, while even those who are residents in such community are enabled in this way to make their wants and their recommendations known. If so with the servant, still more strongly is this the case with the master, who has no other way of becoming generally acquainted with persons seeking employment. If this is the case with intelligence offices, still more marked are the benefits in both lines arising from mercantile agencies. There is no question as to the great impulse given by them, and especially by the defendants in the case before us, to business. I may be, for instance, a trader in a small country town, and may be desirous of obtaining goods from a wholesale house in New York. Under the old system I would be obliged to send a check in advance, which I might feel a hesitancy in doing when dealing with a stranger, or which I might, in the exigencies of local trade, find inconvenient. Now, however, it is sufficient for me simply to order the goods, and they are sent to me if my credit is good enough to obtain for me a favorable report from the mercantile agency to whom the seller resorts. So, on the other hand, if I am a wholesale dealer, I can fill orders promptly and freely without the delay and expense of making personal inquiries as to customers. It may be in general stated that in the affording facilities and business, mercantile agencies come next in the rank of importance to railroads and telegraphs. But with their utility their confidential character is closely bound up. Were they not confidential,—in other words, were the information they collect published to the world,—mercantile agencies would soon cease to exist. The policy of the law not only tolerates, but approves, such confidential communication of information as tends to the securing of employment, or the buying and selling of goods. But the policy of the law not only would not tolerate, but would extirpate, agencies for the publishing to the world at large of information as to the private affairs of individuals.

The utility of mercantile agencies being unquestionable, and their utility being dependent on their confidential limitations, it is not strange that these limitations should be not only maintained, but insisted on, by the courts. And this is in two ways. If the limitations of confidence are thrown off by the agency,—in other words, if it publishes to the world the information it collects,—then it is liable in damages to parties whose characters it disparages, or whose standing it impugns. On the other hand, if it confines itself to the confidential communication of such information to its customers, then if it acts *bona fide,* and without malice or recklessness, these communications are privileged, and the defendant, if sued for a libel in making such communications, would be entitled to a verdict. *Meddlesomeness,* it should be remembered, is an important test to be kept in mind in cases of this class. If a communication be merely meddlesome, if it be not dictated by a lawful business obligation or by a lawful personal duty, then privilege cannot be invoked.[1] In other words, as is stated by Sir JAMES STEPHEN, " the publication of a libel is not a misdemeanor if the defamatory matter published is honestly believed to be true by the person publishing it, and if the relation between the parties by

---

[1] Shipley v. Todhunter, 7 C. & P. 680.

and to whom the publication is made, is such that the person publishing it is under any legal, moral, or social duty to publish such matter to the person to whom the publication is made, or has a legitimate personal interest in so publishing it, provided that the publication does not exceed, either in extent or in manner, what is reasonably sufficient for its occasions."[1]

The leading cases in this line, and the first precedent for the position here maintained, are those in which suits were brought by servants, alleging that they had been injured by information given as to their character by their former or present employers. In these cases it has been held that a master applied to for the character of a servant is privileged to give what he conceives to be a correct answer; and no action lies for the answer if it turns out to be incorrect, supposing it to have been honestly given. It is otherwise, however, where a false answer is given maliciously.[2]

It has also been held that confidential communications between officers of trusts as to servants and customers are in like manner and with the like limitations privileged.[3] But privilege in such cases is lost by publication to the world.[4]

In respect to mercantile agencies the same distinctions are applied, not only in the case in the text, and in *Erber* v. *Dun*,[5] there cited, but in several state rulings. Thus, in *Com.* v. *Stacey*,[6] ALLISON, J., said: "A business such as that conducted by the defendant, if properly managed, may be of the greatest service to the business men of the country; but if carried on with a reckless disregard of the rights of others, may be converted into an evil against which no man can protect himself. * * * There is no great hardship imposed on an agency of this kind, if they are required to know beforehand that their statements are true, *and that the persons to whom they are sent have an interest in receiving the information.*" That such communications, when given under these limitations, are privileged, is held also in New York and Wisconsin,[7] though it is conceded that general publication destroys the privilege.[8] And it has been held that "a confidential relationship clearly exists where the parties are principal and agent, solicitor and client, guardian and ward, partners, or even intimate friends; in short, wherever any trust or confidence is reposed by one in the other."[9] At the same time, it has been decided that a circular letter sent by the secretary to the members of a society for the protection of trade against swindlers, such letter being volunteered, and sent to all members generally, is not privileged.[10] It is otherwise when the communication is in response to a specific question by the party interested.[11]

FRANCIS WHARTON.

[1] Steph. Dig. Cr. Law, § 273.

[2] Hargrave v. Le Breton, 4 Burr. 24, 25; Pattison v. Jones, 3 Man. & R. 101; 8 B. & C. 578; Child v. Affleck, 9 B. & C. 4(3; 4 Man. & R. 338; Kelly v. Partington, 4 B. & Ad. 700; Carrol v. Bird, 3 Esp. 201; Dale v. Harris, 109 Mass. 193. See Gardner v. Slade, 13 Q. B. 796; Fowler v. Tiffany, 30 N. Y. 20.

[3] Blackburn v. Blackburn, 4 Bing. 395; 3 C. & P. 146; Green v. Chapman, 5 Scott, 340; 4 Bing. N. C. 92.

[4] Philadelphia R. R. v. Quigley, 21 How. 202.

[5] 12 Fed. Rep. 526.

[6] 8 Phila. Rep. 617.

[7] Ormsby v. Douglass, 37 N. Y. 477; State v. Lonsdale, 48 Wis. 348.

[8] Sunderlin v. Bradstreet, 46 N. Y. 188. See Robshaw v. Smith, 28 L. T. 423, cited Odgers, Libel, 207.

[9] Odgers, Libel, 210; citing Davis v. Reeves, 5 Ir. C. L. R. 79, where it was held that a regular solicitor was privileged to give such information to his client in all matters concerning his client's interest.

[10] Taylor v. Church, 4 Seld. 452; Sunderlin v. Bradstreet, 46 N. Y. 188; Beardsley v. Tappan, 4 Seld. 452.

[11] Id.; Ormsby v. Douglass, 37 N. Y. 477.