EBENEZER HOLMES, Respondent, *v.* GILBERT E. JONES, as Treasurer of the New York Times, Appellant.

1. LIBEL — RIGHT OF RECOVERY. The publication of a libel is a wrong-ful act, presumably injurious to those persons to whom it relates, and in the absence of legal excuse gives a right of recovery irrespective of the intent of the defendant who published it, and this, although he had reason to believe the statement to be true, and was actuated by an honest or even commendable motive in making the publication.

2. LIBEL — DAMAGES. The amount of damages in an action for libel is peculiarly within the province of the jury; they may give nominal damages, or damages to a greater or less amount as they shall determine; they may accord damages which are merely compensatory, or damages beyond mere compensation, called punitive or vindictive damages, by way of example or punishment, when in their judgment the defendant was incited by actual malice or acted wantonly or recklessly in making the defamatory charge.

3. LIBEL — EVIDENCE IN MITIGATION. While a defendant cannot show, in mitigation of damages for a specific libel, other and disconnected immoralities on the part of the plaintiff, but can attack only the plaintiff's general character, yet where two charges in an alleged libelous publica-tion relate to the same subject-matter and are not disconnected and inde-pendent, and the plaintiff submits only one of the charges to the jury, although the other charge was also counted on in the complaint and justi-fied in the answer, the defendant may, under certain circumstances, give evidence in substantiation of such other charge, in mitigation of damages on the charge submitted to the jury.

4. LIBEL — EVIDENCE IN MITIGATION. The plaintiff in an action for libel was an undertaker, who had rendered some services at Mount McGregor in preparing the body of General Grant for burial. It appeared that the plaintiff had provoked, by writing a letter to a certain news-paper, public discussion of the non-payment of his bill by General Grant's

family, and that the defendant newspaper had replied in the alleged libelous article, which charged the plaintiff with presenting an extortionate bill and with intoxication at the time he performed the service. The complaint counted on both charges, and the answer justified both. On the first trial, the defendant established a justification of the charge of extortion. On a second trial, the plaintiff omitted to read to the jury the part of the libelous article which charged extortion, but put in evidence only the part which alleged intoxication. The defendant put in evidence the whole article and gave evidence tending to justify the charge of drunkenness, and upon this issue, the only one submitted, a verdict was rendered for the plaintiff for punitive damages. During the trial, the defendant offered to prove, in mitigation of damages, the truth of the alleged libel relating to the subject of extortion, but the evidence was excluded. *Held*, that, under the circumstances of the case, it was competent for the defendant, in mitigation of damages as to that part of the alleged libel charging drunkenness, to show that the charge of attempted extortion was true; and that the refusal to permit this was reversible error.

Mem. of decision below, 78 Hun, 609.

(Argued May 28, 1895; decided October 8, 1895.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made May 8, 1894, which affirmed a judgment in favor of plaintiff entered upon a verdict in an action for libel.

This is the second appeal to this court in this action. On the former appeal,[*] the judgment in favor of the plaintiff was reversed because of the refusal of the trial judge to instruct the jury that the defendant had established a justification of the charge in the article of November 22, 1886, imputing dishonesty and unfair dealing on the part of the plaintiff in presenting an unjust and exaggerated claim to the family of General Grant, for his services as undertaker on the occasion of the death of General Grant, July 23, 1885.

On the second trial, the plaintiff, although he had set forth in his complaint this charge as to the unjust and extortionate character of the claim of Holmes & Co. as one of the grounds of action, omitted to read this part of the libelous article to the jury, but put in evidence and read to the jury that part only which alleged in substance that on the afternoon and

[*] 121 N. Y. 461.

evening of the 23d of July, during the time when, as the plaintiff claimed, he was rendering service as undertaker, he was intoxicated. The defendant in his answer justified both the charge of attempted extortion and the charge of drunkenness, and also alleged, in mitigation of damages, the circumstances under which the publication was made.

The defendant, after the plaintiff had rested, put in evidence and read to the jury the whole article and gave evidence tending to justify the charge of drunkenness. This was met by counter evidence on the part of the plaintiff, and upon this issue (the only one which was submitted to the jury) the jury found for the plaintiff and rendered a verdict in his favor for $3,500. During the course of the trial the defendant offered to prove in mitigation of damages that the plaintiff presented to the family of General Grant an exorbitant bill for his services, and in substance to prove the truth of the alleged libel relating to that subject. The plaintiff objected to the evidence and the court excluded it, and the defendant excepted. The question is, was it competent for the defendant, in mitigation of damages as to that part of the alleged libel charging drunkenness, to show that the charge of attempted extortion made in the article was true. The plaintiff, who carried on the business of an undertaker at Saratoga Springs, was, through Mr. Arkell, and by direction of Dr. Douglas, notified from Mount McGregor on the morning of July 23, 1885, to come to the latter place, and immediately responded to the notification and took charge of the body and proceeded with the process of embalming. In the afternoon of the same day Mr. Merritt, an undertaker from New York, who had been sent for by the son of General Grant, arrived and from that time assumed control. He superseded the plaintiff and practically the whole service rendered by the plaintiff was confined to what he did preceding the arrival of Merritt. He, however, visited Mount McGregor daily until the 30th of July, the day when the body was taken to New York. Subsequently the plaintiff sent a bill for $500 to Col. Grant for his services and disburse-

ments.   The bill was given by Col. Grant to Merritt.   Correspondence ensued between Merritt and the plaintiff.   At Merritt's suggestion the plaintiff had an interview with an army officer of the United States with respect to the bill, but it was not paid.   Several months later the plaintiff sent the bill again to Col. Grant, who returned it accompanied with a letter in substance denying the validity of the claim and stating that Mr. Merritt was alone employed to superintend the preparations for the funeral of General Grant, and advising plaintiff that the bill should be presented to Merritt.   On the 30th of September of the next year a telegraphic dispatch purporting to have been sent from Saratoga Springs was printed in *The Sun*, a newspaper of the city of New York, stating that the plaintiff's firm had notified Mr. Arkell of a suit about to be brought against him for services rendered by the firm in embalming the body of General Grant, and purporting to give an account of the services.   It stated that the bill (a copy of which was given) had been presented to everybody connected with the family of General Grant except Mrs. Grant, and had been " repudiated all around," and that the attorney for the plaintiff said " that he had found no one connected with the deceased general who seems to feel any moral obligation to pay for the care of his remains and their preservation for burial, and so they decided to sue Mr. Arkell."   Appended to the dispatch as published was a statement from the editor of *The Sun* that " If Messrs. Holmes & Co. will be good enough to send the bill in question to the editor of *The Sun*, he will remit them the amount."   A few days later, on the 4th of October, 1886, a letter from Holmes & Co., addressed to the editor of *The Sun* was printed in that paper, purporting to be " a plain statement of the facts" relating to the bill of Holmes & Co., in answer to the many statements made in the public press, " which are either perversions of the truth or positive falsehoods."   The letter then proceeded to narrate the circumstances of the employment of Holmes & Co., the services rendered, the efforts made to collect the bill and their failure, and that as a last resort they were advised

to-fall back on Mr. Arkell. Referring to the circumstances of this employment and their subsequent treatment the writers said : " We feel a degree of certainty, however, that if the dead general were now alive he would see that similar services rendered to his household should not remain long unpaid, nor hesitate to acknowledge a claim in favor of those who performed them." The letter concluded with an intimation that if the offer of *The Sun* was still open and those whom the writers deemed " legally and morally bound to pay the claim " do not pay it, the offer would be accepted. Subsequently, and on the 13th of October, 1886, the bill was paid to Holmes & Co. by *The Sun* and the fact of such payment was announced in that paper. Meanwhile after the publication of the letter of October 4, 1886, and the payment of the bill, letters were written to *The Sun* by Harrigan and Sullivan, who assisted Merritt in taking charge of and embalming the body, controverting in many respects the statements in the letter of Holmes & Co., but these letters *The Sun* did not publish. Subsequent to the payment of the bill by *The Sun* and before the publication of the alleged libel, correspondence took place between Col. Grant and *The Sun* in which Col. Grant, while denying the justice of the claim, stated that the family were unwilling that the bill should be paid by *The Sun*, and he inclosed a check for the amount, which *The Sun* declined to receive, and it was returned to Col. Grant. On the 22d of October, 1886, a communication from Harrigan, the embalmer employed by Merritt, was published in *The Press & Knickerbocker*, denying many of the statements in the letter of Holmes & Co., and which referred to the payment by *The Sun* of a bill which the family of General Grant pronounced "blackmailing in color," language which was quoted in the alleged libelous article and which forms one of the libelous paragraphs counted on in the complaint.

It was subsequent to the circumstances above mentioned that the alleged libel of November 22, 1886, was published in the *New York Times*. The article is headed " Even beyond the grave. The malice of *The Sun* hounds Gen. Grant." It

states that an undertaker's bill was used as a "pretext for causing pain to the dead hero's family." The plain intent of the article was to denounce *The Sun* for its officious and offensive interference in paying the bill of Holmes & Co., without the knowledge of the family of General Grant, and the justice of which they denied. The article purports to give a history of the services rendered by Holmes & Co. It refers to the publication of the dispatch of September 30, 1886, and the appended offer of *The Sun* to pay the bill of Holmes & Co., made without consultation with the family of General Grant; to the letter from Holmes & Co. of October 4, 1886, and the refusal of *The Sun* to publish the letters from Harrigan and Sullivan; to the pain caused to General Grant's family by the payment by *The Sun* of the bill, and to the subsequent correspondence between *The Sun* and Col. Grant before alluded to. It characterized the action of *The Sun* as wholly "unnecessary and malicious." The article then proceeds to give the statements made by Merritt, the undertaker who superseded the plaintiff in charge of the body, to a reporter of *The Times.* The interview relates to the services rendered by Holmes & Co., and the report contains the statements as to the intoxication of the afternoon and evening of the 23d of July, 1885, which, with the charge as to the extortionate character of the bill of Holmes & Co., constitute the libelous matter counted on in the complaint.

*B. F. Einstein* for appellant. It was error to exclude the evidence offered to show that the bill for $500 rendered by Holmes & Co. was unjust and exorbitant. (121 N. Y. 461; *Beardsley* v. *Maynard*, 4 Wend. 337; *Voltz* v. *Blackmar*, 64 N. Y. 440; Townshend on Libel, 683, § 415; 2 Greenl. on Ev. §§ 243, 267, 275, 425; *Dalton* v. *Gill*, 25 Hun, 120; *Kiff* v. *Youmans*, 86 N. Y. 324; *Hotchkiss* v. *Lathrop*, 1 Johns. 286; *Duncan* v. *Brown*, 15 B. Mon. 186; *Powers* v. *Presgroves*, 38 Miss. 241; *Cooke* v. *Hughes*, R. & M. 713; *Hinman* v. *Hare*, 5 N. Y. S. R. 504; *O'Garry* v. *Einsenlough*, 38 N. Y. 296.) The evidence excluded was admissible

in reduction of damages which the plaintiff claimed he suffered in his business. (*Sanderson* v. *Caldwell,* 45 N. Y. 398; Code Civ. Pro. § 536.)

*Matthew Hale* for respondent. The trial court properly excluded the evidence offered by defendant to show that the bill rendered by Holmes & Co. for their services was exorbitant and unjust. (*Palmer* v. *Haight,* 2 Barb. 210; *Hamilton* v. *Eno,* 81 N. Y. 117; *Cooper* v. *Barber,* 24 Wend. 107; *Stiles* v. *Comstock,* 9 How. Pr. 48; *Hopkins* v. *Smith,* 3 Barb. 599; Odgers on Libel [1st Am. ed.], 305; Townshend on Sland. & Lib. § 407; *Andrews* v. *Vanduzer,* 11 Johns. 38; *Root* v. *King,* 7 Cow. 613; 4 Wend. 114; *Hatfield* v. *Lasher,* 81 N. Y. 246; *Fountain* v. *West,* 23 Ia. 9; *I. J. Co.* v. *Pough,* 33 N. E. Rep. 991; *Huff* v. *Bennett,* 6 N. Y. 337, 339; *Parkhurst* v. *Ketchum,* 6 Allen, 406; *Peterson* v. *Morgan,* 116 Mass. 350; *Ross* v. *Lapham,* 14 id. 275; *Voltz* v. *Blackmar,* 64 N. Y. 440.)

ANDREWS, Ch. J. The primary purpose of the article published in *The New York Times* November 26, 1886, containing the defamatory matter for which the action was brought, was to expose the conduct of *The Sun* in officiously offering to pay, and in subsequently paying the claim of Holmes & Co., for alleged services in embalming and caring for the body of General Grant, after the claim had been repudiated by his family and its justice had become the subject of public comment. The offer to pay the bill made in the columns of *The Sun,* which, as was stated by Holmes & Co. in their letter of October 4, 1886, " was under no legal or moral obligation " to pay it, appended to a statement which imputed to the family of General Grant in their dealings with Holmes & Co., a disregard of honor and moral obligation, was well calculated to wound the feelings of the members of the family and to excite the indignation of their friends and the friends of the illustrious soldier whose name was associated with the transaction. The offer carried an implication that the family of General

9

Grant had disregarded and refused to recognize an honest claim for services connected with the preparation of his body for burial, which, if well founded, would justly expose them to animadversion. This was the occasion for the article in *The Times*, and the plaintiff had made himself a party to the controversy by his letter to *The Sun* of October 4, 1886, in which he put himself in the attitude of having a just claim for services rendered for the amount of the bill rendered by Holmes & Co., which the family of General Grant had declined to recognize, and, to accentuate the alleged injustice with which he was treated, he intimated his willingness to accept the public offer of a stranger to the transaction to pay the claim in case " those whom we think are legally and morally bound to pay the claim do not sooner recognize their obligation by its payment." The plaintiff had, by his own act in writing the letter of October 4, 1886, thrust himself and his conduct into the arena of public discussion, and, as might reasonably have been anticipated, the charge made against the family of General Grant of delaying and repudiating the payment of an honest claim was met by public denial in the New York papers, and a public criticism of the origin and character of the claim asserted by Holmes & Co. The defendant failed to establish before the jury the justification set up in the answer to the statement in the article in *The Times*, that the plaintiff was intoxicated in the afternoon and evening of July 23, 1885, during his alleged employment at Mount McGregor. The evidence upon the point was conflicting, but the finding of the jury determines the fact in favor of the plaintiff. The plaintiff was, therefore, entitled to recover damages for this misstatement. It was defamatory, and while there is no ground to suppose that the statement was instigated by actual malice or ill-will towards the plaintiff, its absence constitutes no answer to the claim for damages. The publication of a libel is a wrongful act, presumably injurious to those persons to whom it relates, and in the absence of legal excuse gives a right of recovery irrespective of the intent of the defendant who published it, and this

although he had reason to believe the statement to be true, and was actuated by an honest or even commendable motive in making the publication. But the amount of damages in an action for libel is peculiarly within the province of the jury. The jury may give nominal damages, or damages to a greater or less amount, as they shall determine. The jury may accord damages which are merely compensatory, or damages beyond mere compensation, called punitive or vindictive damages, by way of example or punishment, when in their judgment the defendant was incited by actual malice or acted wantonly or recklessly in making the defamatory charge. (*Taylor* v. *Church*, 8 N. Y. 452.) The trial judge left it to the jury to determine, in case they should find for the plaintiff, the whole subject of damages, and whether punitive damages should be awarded. The plaintiff having practically withdrawn from the jury the consideration of the charge in the article that he had presented an unjust and extortionate bill, by not reading that part of the article to the jury, although it was counted on in the complaint, the defendant had no occasion to justify that charge, although a justification was set up in the answer. The omission of the plaintiff to rely upon this charge was apparently to avoid a trial of the issue of justification thereon, which, on the former appeal in this case, was held to have been established (121 N. Y. 461). On the trial now under review, the defendant offered in substance to prove, in mitigation of damages of the charge of intoxication, that the bill presented by Holmes & Co. was unjust and extortionate, and if the evidence was competent for that purpose, the pleadings were in proper form to permit its introduction. We are of the opinion that, under the circumstances of the case, the evidence should have been admitted. Of course, the fact that the plaintiff had presented an extortionate bill did not tend to show the truth of the charge of intoxication, nor did it tend to disprove malice on the part of the defendant in making the latter charge that another and dissimilar charge in the same article was true. When the article was published, the defendant only knew from information as to the truth of

either charge. That *The Times* believed the article to be true in both respects and that in making the statements therein it relied upon what it supposed to be credible information, was permitted to be shown. Whether the information was actually true, it could not know at the time, and so far as its motive was concerned, and whether or not it was actuated by actual malice in making the charge of drunkenness, the actual fact subsequently proved of the truth of the charge of extortion could have no retroactive influence in determining the *quo animo* of the publication. (*Hatfield* v. *Lasher*, 81 N. Y. 246.) But we think the excluded evidence was admissible as bearing upon the conduct of the plaintiff in the transaction which he had aided in bringing before the public. It must be assumed, in view of the evidence offered and its rejection upon the plaintiff's objection, that he had posed before the public as having an honest claim, which had been dishonestly rejected, when in truth the claim made was dishonest and unjust. The plaintiff had by his conduct invited public discussion of the transaction. The article was written and published to meet the aspersions cast by the plaintiff and others upon the family of General Grant. It truly (as must now be assumed) exposed the conduct of the plaintiff as a distinct attempt, through appeals to the public and otherwise, to coerce the payment of a dishonest claim. In giving what purported to be a history of the transaction, *The Times* superadded a false and calumnious incident, without actual malice, as the jury might well have found. The two charges were made in respect of the same subject-matter. They related to the same transaction. The plaintiff makes no denial of the main matter in which the calumny originated, namely, the extortionate and unjust bill, but does deny the truth of one of the incidents of his conduct alleged in the article. He comes claiming damages for injury to his character. It is well settled that a defendant cannot show, in mitigation of damages for a specific libel, other and disconnected immoralities, but can attack only the plaintiff's general character. But the charges in the article were not disconnected and independent in any

proper sense, and we think it plain in reason that the plaintiff ought not in justice to recover punitive damages for a misstatement in the article as to his intoxication, if it appeared that his conduct in other matters in the transaction to which the charge related had been reprehensible, and when he himself had provoked public discussion. The conduct of both parties in the whole matter should have been permitted to be shown, so as to aid the jury in determining the extent of the damages to be awarded.

The judgment should be reversed and a new trial ordered. All concur.

Judgment reversed.