### NEW YORK EVENING POST CO. v. CHALONER.

(Circuit Court of Appeals, Second Circuit. February 18, 1920.)

#### No. 120.

1. **Courts** ⬅⟹343—**Name in which action must be brought governed by state practice.**

    The question of the name in which an action must be brought is one of procedure, as to which, under the Conformity Statute (Comp. St. § 1537), the federal courts ordinarily follow the local state practice.

2. **Parties** ⬅⟹1—**Capacity to sue depends on law of forum.**

    The capacity of a party to sue in a federal court depends on the law of the forum, and not upon that of the domicile.

3. **Courts** ⬅⟹343—**Person locally adjudged insane may not sue in federal court.**

    A person declared insane by the courts of New York, as long as that judgment remains in effect, *held* not to have the capacity to maintain an

---

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

action in a federal court in New York in his own name, although he had subsequently been adjudged sane in the state of his residence.

**4. Parties ☞58—Person having legal right as plaintiff may be substituted.**

There may be a substitution of parties plaintiff, where it involves no change in the cause of action and the person substituted is the one having the legal right to enforce it.

**5. Courts ☞311—Jurisdiction of federal court depends on citizenship of representative plaintiff.**

The citizenship of a plaintiff suing in a representative capacity, unless the relationship is merely formal, and not that of the person or persons for whose benefit the action is brought, determines the jurisdiction of a federal court.

**6. Evidence ☞207(2)—Court may act on admissions of counsel.**

A court may accept and act on admissions of counsel made in argument or on trial of a cause.

**7. Insane persons ☞94½—Incapacity of insane plaintiff cured by restoration of rights pendente lite.**

Where, pending an action in a federal court, which plaintiff was without capacity to maintain because of a judgment of a court of the state adjudging him insane and appointing a committee of his person and property, such judgment was vacated and his property and rights restored, such fact may be entered of record in the cause and accepted as curing the original defect of parties.

**8. Appeal and error ☞1048(2)—Denial of examination as to competency not reversible error.**

Refusal to permit voir dire examination of a witness as to his mental competency *held* not reversible error, where the opposing party was given full opportunity on cross-examination and there was no request to introduce other testimony on the subject.

**9. Appeal and error ☞971(2)—Competency of witness question within court's discretion.**

The mental competency of a witness is a question for the court, and its determination is not to be disturbed unless it clearly appears that its decision was erroneous.

**10. Libel and slander ☞7(6)—Article referring to one as an "assassin" is libelous per se.**

A published article referring to a person as an "assassin," without qualifying language, is libelous per se, and an instruction that it amounted to a charge of murder *held* not erroneous.

**11. Libel and slander ☞124(8)—Instruction permitting punitive damages approved.**

An instruction, in an action for libel by charging plaintiff with a crime, which permitted the jury in their discretion to award punitive damages if they found that the article had been recklessly published, *held* not erroneous.

**12. Libel and slander ☞71—That libel was not believed not a defense.**

The right to recover damages for publication of an article libelous per se is not lost because of the fact that it was not believed.

In Error to the District Court of the United States for the Southern District of New York.

Action by John Armstrong Chaloner against the New York Evening Post Company. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 260 Fed. 335.

Writ of certiorari dismissed 252 U. S. —, 40 Sup. Ct. 396, 64 L. Ed. —.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This cause comes here on writ of error to the United States District Court for the Southern District of New York.

The plaintiff in error, defendant below, is hereinafter referred to as defendant. The defendant in error, plaintiff below, is hereinafter referred to as plaintiff.

The action is brought by plaintiff in his character as a citizen of the state of North Carolina against defendant, a citizen of the state of New York; the latter being a corporation organized under the laws of the latter state.

The defendant is the owner, proprietor, and publisher of a newspaper called the Evening Post, which is published in the city of New York and circulated throughout the United States.

The complaint alleges that the plaintiff is a well-known and highly respected citizen of the United States, is one of the leading art patrons therein, is a member of one of the leading families of the United States, and is of high social standing.

It is alleged, too, that in March, 1909, at the plaintiff's place in Virginia, while plaintiff was endeavoring to prevent one Gillard from assaulting and injuring his (Gillard's) wife, Gillard was accidentally shot and killed; that the matter was made the subject of inquiry in said state, and that after a proper hearing the jury found and determined that Gillard came to his death by the accidental discharge of a revolver in the hands of Gillard and the plaintiff while the latter was endeavoring to prevent the former from attempting to kill his wife.

It is also alleged:

That defendant well knowing the facts aforesaid and contriving and wickedly and maliciously intending to injure this plaintiff in his good name, fame, and credit and to bring him into public scandal, infamy, and disgrace with and amongst his neighbors, friends, and associates, and other good and worthy citizens, and to cause it to be suspected and believed by them that this plaintiff had been and was guilty of the offense and criminal act hereinafter mentioned, made and charged upon him by said defendant, and to vex, harass, and oppress him, did on said date falsely, wickedly, and maliciously publish and procure to be published in said county of New York in its said newspaper called the Evening Post, the following article of and concerning this plaintiff:

"The latest prominent assassin had the rare foresight to have himself declared insane before he shot his man."

That said article is a false, scandalous, and defamatory libel, and was published by said defendant concerning this plaintiff, as was well known to said defendant. That no extrinsic facts for the purpose of showing the application to this plaintiff of said defamatory matter are necessary, but such application had been publicly recognized, as appears from an article in Harper's Weekly, a well-known paper, published in the city of New York, in its edition of March 27, 1909, of which article the following is a copy:

"Uncivil.

"'The latest prominent assassin had the rare foresight to have himself declared insane before he shot his man.'"—New York Evening Post.

"When a man has been promptly found by his neighbors to have shot in self-defense, it is hardly polite to call him an assassin, even though his name is not given. It is all the less polite when he intervened to protect a threatened woman."

Damages in the sum of $100,000 were asked.

The defendant entered a demurrer and put in a plea in abatement in which it alleged a want of jurisdiction in the District Court in that plaintiff was without legal capacity to sue and was not the proper party to sue, having been adjudged of unsound mind by the Supreme Court of the State of New York which had appointed a committee of his person and estate. The demurrer and the plea in abatement were overruled.

The defendant then put in an answer in which it set up several distinct defenses on the merits. It also filed a petition in which it asked that the committee of the plaintiff be authorized to prosecute the action for the plaintiff or be substituted as plaintiff in the action. This was denied.

The jury found a verdict in favor of plaintiff in the amount of $30,000. The court thought the verdict was excessive in view of the fact that plaintiff

had not been mentioned by name, and as the shooting affair was referred to in a small squib which was not marked by head lines. The court declared he would set the verdict aside unless the plaintiff stipulated within five days to reduce it to $17,500. The defendant consented to this reduction of the verdict, and judgment was entered accordingly.

Wherry & Mygatt, of New York City (William M. Wherry, Jr., Frederic E. Mygatt, and White & Case, all of New York City, of counsel), for plaintiff in error.

Kaplan, Kosman, Streusand & Ware and George M. Curtis, Jr., all of New York City (Samuel Seabury, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is in some respects a remarkable and perplexing case. The action was commenced in May, 1909, but it was not until May, 1919, that it was actually brought to trial before Judge Augustus Hand. The trial occupied six days, the defendant at the close of the plaintiff's case declining to put in any evidence.

In June, 1909, defendant demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action, and upon the further ground that plaintiff did not have legal capacity to sue in that he had been adjudged an incompetent by the Supreme Court of New York. The demurrer was heard before Judge Coxe on February 11, 1910, and his order overruling the demurrer and requiring defendant to answer within 20 days was filed on March 3, 1910. Thereupon defendant answered denying, among other things, that the shooting referred to in the complaint was accidental, and setting forth three defenses. The answer again raised the question as to plaintiff's competency by a plea in bar of procedure, alleging that plaintiff did not have legal capacity to sue. The New York Code permitted that plea to be made either by demurrer, if the facts appeared on the face of the complaint, or by answer. The facts appeared on the face of the complaint and were also set up in the answer. Thereafter defendant moved before Judge Learned Hand in October, 1917, for an order authorizing the committee of the plaintiff, which had been appointed in the state of New York, to conduct the action for the plaintiff and to be substituted for or joined as plaintiff therein, and the motion was denied. Judge Hand said:

"If the incapacity appeared on the face of the complaint, then the judgment on the demurrer was wrong, but I cannot reverse it; correction of that error must await an appeal from the final judgment. If the judgment on the demurrer was right, the incapacity did not appear on the face of the complaint, and if not pleaded by answer was waived for all time. Section 499, New York Code."

The incapacity did appear on the face of the complaint, and the answer did raise the issue.

In March, 1919, a motion was made before Judge Mayer for a separate trial of the issue as to the plaintiff's capacity to sue, and a separate trial of that issue was ordered. The trial of that took place before

Judge Dietrich, a jury trial having been expressly waived, and on April 28, 1919, he overruled the plea of incapacity and in his opinion said that—

"The precise question has apparently not been passed upon in any of the preliminary proceedings in the case or any related proceedings."

In disposing of the plea as to the incapacity to sue, which was very fully argued before him, the learned District Judge was evidently of the opinion that he was controlled by the opinion previously rendered by Judge Coxe, and as to which Judge Learned Hand had as we have seen disapproved. In the argument before him Judge Dietrich said:

"Gentlemen, while I do it with a great deal of misgiving, in fact I think my own impression is against the view, I think so far as this motion is concerned that I shall follow the ruling of Judge Coxe to the demurrer. I doubt the propriety of coming here and taking a different view upon a question like this in which the facts are precisely the same upon which Judge Coxe ruled."

When the case finally came on for trial, counsel for defendant stated that he was in court pursuant to the order of Judge Dietrich to try the case on the merits and that he desired to have it entered on the record that he took exception to that order and direction and did not waive his rights to object to the jurisdiction of the court on the ground that plaintiff by reason of his incapacity to sue had no power to confer on the court jurisdiction to try the suit on the merits.

It appears that on June 23, 1899, an order was entered in the Supreme Court of the state of New York, held in and for the county of New York, by which it was adjudged that the plaintiff was a person of unsound mind and incapable of managing his person and property, and a committee of his person and estate was appointed. That order was in full force and effect at the time the present action was commenced and during all the proceedings in the court below.

It appears, however, that in September, 1901, the plaintiff being at the time a resident of the state of Virginia, a proceeding was instituted in the court for the county of Albermarle in that state by one Randolph praying for an investigation into the plaintiff's sanity. It was found and determined in that proceeding that the plaintiff was sane and capable of taking care of his person and property, and an order to that effect, dated November 6, 1901, was duly entered. This fact is pleaded in the complaint in this action.

In June, 1905, an order was made by the superior court of Halifax county, N. C., denying an application to dissolve an injunction in a suit brought by the plaintiff against a corporation; the basis of the application to dissolve the injunction being that the plaintiff had been adjudicated insane and incompetent to manage his affairs in the state of New York. This is set up in the reply.

It also appears that prior to bringing this action the plaintiff claimed that the action of the New York court in appointing the committee was void because he was at the time a resident of the state of Virginia and was fraudulently brought into the state of New York. He had therefore instituted an action against his committee, in the District

Court of the United States for the Southern District of New York, in which he sought to recover possession of his property and damages for its wrongful withholding. The District Court directed a verdict for defendant, and the case coming before this court on writ of error was affirmed. Chaloner v. Sherman, 215 Fed. 867, 132 C. C. A. 96. The case then went to the Supreme Court, where the judgment of this court was affirmed. 242 U. S. 455, 37 Sup. Ct. 136, 61 L. Ed. 427. The Supreme Court held that the action of the New York court could not be attacked collaterally by proof that the plaintiff was and remained a citizen of another state, or that he was served in the proceedings through being corruptly lured into New York and there illegally committed to a private hospital, or that the adjudication of insanity was made on perjured evidence while he was actually sane, or that his sanity and competency had been established by a later adjudication of a court of his domicile and had since continued. The court held that the action taken in New York was not void, and if it was to be set aside the remedy must be sought by a direct proceeding to that end.

The plaintiff insists that, as he brings this action in his character as a citizen of the state of North Carolina, his capacity to sue is in no way affected by the fact that he had been declared of unsound mind in the state of New York, inasmuch as in the state of his domicile it had since been decided that he was of sound mind. He insists also that the question of his capacity to sue in a federal court in New York is not an open one in this court because of what was said in Chanler v. Sherman, 162 Fed. 19, 88 C. C. A. 673, 22 L. R. A. (N. S.) 992. That case was decided in this court in 1908, by Judges Lacombe, Coxe, and Noyes. The plaintiff as a citizen of Virginia had brought an action in the Circuit Court in the Southern District of New York against his committee, averring that the orders of the Supreme Court of New York in adjudging him of unsound mind and in appointing the committee were void, and demanding damages for the conversion of his property. That action had not yet been tried, but the time of trial was approaching. As a citizen of Virginia the plaintiff had filed a petition in the court below stating that his presence as a witness at the trial was imperatively required, and that if he returned to New York he was threatened with reincarceration in the asylum, and he prayed for an order protecting him while in the state of New York attending the trial. This court held that a writ of protection should issue. In the course of the opinion it was said that the plaintiff came into the court below "with a decree of the court of the state of which he was a citizen declaring his sanity. We cannot disregard that decree. In considering it we do not ignore the orders of the courts of New York. Insanity is not necessarily permanent. For the purposes of this petition—laying aside jurisdictional questions—we may properly consider that the petitioner was insane when so declared in New York, but that he had recovered his sanity when he was declared sane in Virginia." It will be noted, however, that in what was said jurisdictional questions were expressly excluded. But great stress is placed on the statement that the court should regard Chaloner as having regained his sanity in view of the Virginia decree. What was said on that subject

is to be understood as applying to the case as it appeared on the face of the pleadings which alleged that the proceedings in New York were void because of fraud and want of jurisdiction. The cause went to trial and the court directed a verdict for defendant. It was brought into this court on writ of error and the judgment below was affirmed. We then held that the judgment of the New York court was not a void judgment and must remain valid until reversed or set aside by the courts of New York. In the course of the opinion it was said:

"Insanity is, of course, not necessarily a continuing condition, but the trial court was right in holding that Chaloner's present condition never became an issue in the case and could not have become so, unless the court below had been justified in collaterally setting aside the decretal order."

The effect of that decision was that so long as the orders of the Supreme Court of New York remained unreversed or vacated Chaloner was to be regarded in a federal court held in this state as of unsound mind—in any case in which his right to sue was dependent upon the lex fori. Instead of establishing plaintiff's capacity to sue, the decision established the reverse. The case went to the Supreme Court, where it was affirmed. 242 U. S. 455, 37 Sup. Ct. 136, 61 L. Ed. 127. Whether plaintiff's capacity to sue in the case now before the court depends upon the lex fori is a question to be considered in a subsequent portion of this opinion.

A cause of action is the right of the plaintiff and its infringement by the defendant. The elements of a cause of action are: First, a breach of duty owing by one person to another; and, second, a damage resulting to the other from the breach. Post v. Campau, 42 Mich. 90, 3 N. W. 272. In this case the right of the plaintiff which defendant is alleged to have infringed was the right to the security of his reputation. "The security of his reputation or good name from the arts of detraction and slander," Blackstone says, "are rights to which every man is entitled by reason and natural justice; since without these, it is impossible to have the perfect enjoyment of any other advantage or right." Blackstone's Com. vol. 1, p. 134.

The Constitution of the United States and the Judicial Code give to the plaintiff as a citizen of North Carolina the right to have his cause of action brought into the United States District Court for the Southern District of New York where defendant resides and have it there decided. The Constitution declares that the judicial power of the United States shall extend to controversies between citizens of different states. This case presents such a controversy. That the United States District Court in North Carolina might have heard and decided it if plaintiff had found and served defendant in that district cannot be denied.

It is equally undeniable that the United States District Court for the Southern District of New York, where defendant resided and was served, had jurisdiction to hear and determine it. The Judicial Code, § 51 (Comp. St. § 1033), provides:

"But where the jurisdiction is founded only on the fact that the action is between citizens of different states, suit shall be brought only in the district of the residence of either the plaintiff or the defendant."

The plaintiff's right to have the cause of action determined in a federal court in either district is one and the same. But the manner in which the action shall be brought and the manner in which it shall proceed to final determination may be different owing to differences existing in the lex fori. But that the federal court in the Southern District of New York wherein defendant resides and where service was had has jurisdiction of the cause of action does not seem to us open to controversy. And having jurisdiction of that it could hear and determine the question, if raised, as to the plaintiff's capacity to sue. The question was raised in the court below and was decided in plaintiff's favor. Defendant insists that this was error, and that whether or not the plaintiff had the capacity to sue depended on the law of the forum.

The act of Congress known as the Conformity Act provides that—

"The practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the circuit and district courts, shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the state within which such circuit or district courts are held, any rule of court to the contrary notwithstanding." U. S. Compiled Statutes, § 1537; Barnes' Fed. Code (1919) p. 300, § 1281.

This act requires conformity to be "as near as may be"—not as near as may be "possible," or as near as may be "practicable." Indianapolis & St. Louis Railroad Co. v. Horst, 93 U. S. 291, 301, 23 L. Ed. 898. The intent of the act is well understood to have been to bring about uniformity in the law of procedure in the federal and state courts of the same locality. In Nudd v. Burrows, 91 U. S. 426, 441 (23 L. Ed. 286) the court explained the matter in these words:

"While in the federal tribunals the common-law pleadings, forms, and practice were adhered to, in the state courts of the same district the simpler forms of the local code prevailed. This involved the necessity on the part of the bar of studying two distinct systems of remedial law, and of practicing according to the wholly dissimilar requirements of both. The inconvenience of such a state of things is obvious. The evil was a serious one. It was the aim of the provision in question to remove it."

[1, 2] It must be admitted, we think, that the question whether there is a cause of action is a question of right and not of procedure, but that the question in whose name the action is to be brought and how it is to proceed is one of procedure and not of right, and that in matters of procedure the federal courts follow ordinarily the local state practice. The law of the forum determines the capacity of the party to sue, the form of the action, whether it shall be assumpsit, covenant or debt, all process, both mesne and final, the admissibility or inadmissibility of evidence, as well as the grounds of defenses to actions.

In Rose's Code of Federal Procedure, vol. 1, p. 842, § 902, it is said in reference to the conformity statute that it imposes upon the federal courts in common-law causes the general duty of following the local law respecting the proper parties plaintiff or defendant, and the joinder, substitution, and misjoinder of parties. The writer, however, goes on to point out that this general requirement of conformity is

subordinate to several rules respecting parties which are peculiar to federal practice and which being jurisdictional in character are not subject to infringement or modification by provisions of. state law. The case now before the court does not, however, seem to fall within any of the exceptions named by him.

The Supreme Court has in a number of cases decided that the capacity of a party to sue depends on the law of the forum and not upon that of the domicile.

In Pritchard v. Norton, 106 U. S. 124, 130, 1 Sup. Ct. 102, 27 L. Ed. 104, the court declared that whether an assignee of a chose in action shall sue in his own name or that of his assignor is a technical question of mere process, and determinable by the law of the forum.

In Texas & Pacific Railway Co. v. Humble, 181 U. S. 57, 21 Sup. Ct. 526, 45 L. Ed. 747, the court had before it the capacity of a married woman, who was without capacity to maintain a suit in her own name under the law of her domicile, which was in Louisiana, to maintain an action in a United States court in Arkansas. It appeared that under the law of the latter state a married woman had the capacity to maintain a suit in her own name. The Supreme Court sustained her right to sue in the federal court and held that her right depended upon the law of the forum and not upon that of the domicile.

In Gasquet v. Fenner, 235 Fed. 997 (1916) a bill was filed in a United States District Court in Louisiana by a citizen of Tennessee against the executor of his mother's estate to compel the latter to turn over to him one-third of the estate. The answer admitted the plaintiff's interest in the estate and the amount due him, and that the debts had been paid and legacies delivered, but denied the right of the plaintiff to maintain the action in the United States court in Louisiana. The state courts in Louisiana had adjudged him "incapable of taking care of his person and administering his estate, and pronouncing his interdiction." After establishing himself in Tennessee, a judicial inquiry as to his sanity was instituted in that state and determined in his favor, and it was decreed that he was entitled to a settlement from all persons having control of any part of his estate. This Tennessee judgment was claimed conclusive of his right to maintain his suit in the federal court in Louisiana being entitled to full faith and credit. It was conceded for the sake of argument that plaintiff had acquired a domicile in Tennessee, and that the courts of that state had authority to declare him sane. The District Judge declared that his capacity to sue in Louisiana was not established by the judgment rendered. "The law of Louisiana," he said, "recognizes that insanity may be only temporary, but yet provides that, interdiction having been once decreed, a person interdicted cannot resume the exercise of his rights until after a definitive judgment, repealing the interdiction." The court dismissed the bill saying that in matters of that kind federal courts administer the laws of the states and are bound by the same rules that govern the state tribunals. The Supreme Court affirmed the decree, 247 U. S. 16, 38 Sup. Ct. 416, 62 L. Ed. 956. We are unable to distinguish in principle that case from the case now before us.

[3] It appears to us therefore that the court below was in error in

holding that the plaintiff was entitled to maintain the action in his own name.

[4] Whether the defendant's motion to substitute the plaintiff's committee for the plaintiff should have been granted is another matter. At common law an entire change of plaintiffs is not allowable, being in effect regarded as a change of the cause of action. Hallmark v. Hopper, 119 Ala. 78, 24 South. 563, 72 Am. St. Rep. 900; Holmes v. Pennsylvania R. Co., 220 Pa. 189, 69 Atl. 597, 123 Am. St. Rep. 685. The reason for the rule indicates its qualification, and where there is no change in the cause of action and the party substituted bears some relation of interest to the original party and to the suit the substitution is allowed. Thus a trustee may be substituted for his beneficiary. Owen v. Weston, 63 N. H. 599, 4 Atl. 801, 56 Am. Rep. 547. And when an action is brought by a person who has the beneficial interest in the subject-matter, the person who has the legal right to sue may and should be substituted. McGovern v. Hern, 153 Mass. 308, 26 N. E. 861, 10 L. R. A. 815, 25 Am. St. Rep. 632. The rule referred to could not have prevented the substitution of the committee for the plaintiff because of any want of beneficial interest. There may, however, be another reason why the substitution should not have been made.

[5] The Supreme Court has repeatedly held that representatives stand upon their own citizenship in the federal courts irrespectively of the citizenship of the persons whom they represent—such as executors, administrators, guardians, trustees, receivers, etc. New Orleans v. Gaines' Administrator, 138 U. S. 595, 606, 11 Sup. Ct. 428, 34 L. Ed. 1102; Mexican Central Railway Co. v. Eckman, 187 U. S. 429, 434, 23 Sup. Ct. 211, 47 L. Ed. 245. This rule of construction was adopted as early as 1808 in the case of one suing as a trustee. Chappedelaine v. Dechenaux, 4 Cranch. 306, 308, 2 L. Ed. 627. It was adhered to in 1823 in the case of an executor. Childress v. Emory, 8 Wheat. 642, 5 L. Ed. 705. In the following year Chief Justice Marshall said that it had never been suspected that, if the executor be a resident of another state, the jurisdiction of the federal courts could not be ousted by the fact that the creditors or legatees were citizens of the same state with the opposite party. Osborn v. Bank of the United States, 9 Wheat. 738, 856, 6 L. Ed. 204. In 1870 in Coal Co. v. Blatchford, 11 Wall. 172, 20 L. Ed. 179, the question was whether the jurisdiction of the federal court depended upon the citizenship of the trustees who were the plaintiffs, or of the parties for whose benefit the suit was averred to be brought. And Mr. Justice Field speaking for the court declared that, if the trustees were personally qualified by their citizenship to bring suit in the federal courts, jurisdiction would not be defeated by the fact that the parties whom they represent were disqualified. And see Rice v. Houston, 13 Wall. 66, 20 L. Ed. 484; Bonnafee v. Williams, 3 How. 574, 577, 11 L. Ed. 732. The applicability of the rule does not depend upon whether title is or is not in the representative. While title is in executors, administrators, and trustees, it is not in the guardians or in receivers. It is not of controlling importance therefore in the decision of this particular question that the

committee was not under the law of New York invested with the title to the plaintiff's property.

The rule under consideration is not, however, applied in all cases. In 1809 Browne v. Strode, 5 Cranch. 303, 3 L. Ed. 108, a case was certified to the Supreme Court from a federal court in Virginia. The action was on a bond given by an executor in conformity to a Virginia statute, the bond being executed to the justices of the peace for the county of Stafford and for the faithful execution of the testators. The suit was brought in the federal court by citizens of Virginia against a citizen of the same state for the benefit of a British subject. The Supreme Court ordered it certified that the court below had jurisdiction. No reason was assigned, but the case is explained in Irvine v. Lowry, 14 Pet. 293, 300, 10 L. Ed. 462, where it is said that the plaintiff was a mere nominal party, a mere instrument through whom the legal right of the real plaintiff could be asserted. In 1852 Huff v. Hutchinson, 14 How. 586, 14 L. Ed. 553, a United States marshal, even after he had gone out of office, was held competent to sue, in a United States court, on an attachment bond, citizens of the state of which he himself was a citizen at the time; the bond having been given for the benefit of the plaintiffs in the original action who were citizens of another state. The Supreme Court held that the real plaintiffs were those for whose use the suit was brought and who were averred to be citizens of New York, and that it was immaterial that the marshal and the defendants were alike citizens of Wisconsin; the marshal's relation to the suit being merely nominal.

So in 1844 in McNutt v. Bland, 2 How. 9, 11 L. Ed. 159, the plaintiff was the Governor of Mississippi and the action was brought in his name in a federal court in Mississippi against certain defendants who were also citizens of the same state. The action was brought for the benefit of persons who were citizens of New York. The law of Mississippi required a bond to be given by all sheriffs to the Governor for the faithful performance of their duty. The action was brought against the sheriff and his sureties on the bond. The court in holding that the suit might be maintained stated that the Governor was "a purely naked trustee for any party injured. He is a mere conduit through whom the law affords a remedy to the person injured by the acts or omissions of the sheriff." And Mr. Justice Baldwin writing for the court further said:

"It would be a glaring defect in the jurisprudence of the United States, if aliens or citizens of other states should be deprived of the right of suit on sheriffs' bonds in the federal courts sitting in Mississippi, merely because they were taken in the name of the Governor for the use of the plaintiffs in mesne or final process, who are in law and equity the beneficiary obligees; we think this defect does not exist. * * * In this case there is a controversy and suit between citizens of New York and Mississippi; there is neither between the governor and the defendants: as the instrument of the state law to afford a remedy against the sheriff and his sureties, his name is in the bond and to the suit upon it, but in no just view of the Constitution or law can he be considered as a litigant party: Both look to things not names—to the actors in controversies and suits, not to the mere forms or inactive instruments used in conducting them, in virtue of some positive law."

These cases have not, to our knowledge, been overruled. The committee appointed in New York does not come within the exception of Browne v. Strode and the cases allied with it. The substitution of the committee in the place of the plaintiff would have destroyed the diversity of citizenship necessary to the maintenance of the action. And under the circumstances then existing the action should have been dismissed—without prejudice. To have done so would not have deprived Chaloner of any constitutional right to have his cause of action determined in a federal court. It would simply have postponed his right to proceed therein until he had taken the necessary steps in the courts of the state of New York to have the orders adjudging him of unsound mind and incompetent, and appointing a committee of his person and property, vacated; his sanity having been restored.

[6] This court cannot take judicial notice of the records of the courts of the state of New York within which we are sitting. A court, however, has a right to accept the admissions of counsel made upon the argument or trial of a cause, and may act upon it as circumstances require. This court in Smith v. Standard Sanitary Manufacturing Co., 254 Fed. 427, 166 C. C. A. 59, affirmed a judgment where the court below dismissed the complaint before any testimony was taken because of admissions made by plaintiff's counsel in his opening. And see Oscanyan v. Winchester Repeating Arms, 103 U. S 261, 26 L. Ed. 539, where the court said:

"Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof."

[7] At the argument in this court it was admitted by counsel for both parties that the order adjudging plai 'f insane and incompeten' to manage himself, his property, and his affairs, and appointing a committee of his person and property, had been vacated by the Supreme Court of New York, and that the committee had been discharged. In view of those admissions by both counsel, we have allowed to be filed in the office of the clerk of this court a certified copy of that order. It shows that the order was entered in the Supreme Court of the state of New York held in the county of New York on July 30, 1919, and that such order adjudged the plaintiff to be sane and competent to manage himself, his property, and his affairs. That the committee was therein ordered to return and restore to the plaintiff any and all property belonging to him on or before August 15, 1919, and which was then in the hands of the committee—after deducting all proper expenses and charges. And that the committee was discharged from any further duties as a committee of the plaintiff's person and property.

We know of no reason why the fact that this committee was discharged prior to the final determination of the action, which has been conceded by both sides, should not be entered on the record.

And we direct that the entry be made. This cures the error committed in allowing the suit to proceed in the plaintiff's name alone. It will prevent the necessity of setting aside of the judgment on that ground and save the parties the trouble and expense of litigating this matter again and traversing once more the very same ground already

covered, unless there are other errors which make a reversal necessary, and as to which we shall further inquire. The situation seems somewhat analogous to that where an infant comes of age after the commencement of an action. The action does not abate, but the fact that he has reached his majority is entered on the record and the next friend or guardian ad litem merely steps out of the case and the plaintiff conducts the action as though he had originally commenced it. Encyc. of Pl. & Pr. vol. 10, p. 591.

[8] It appears that when the plaintiff was called as a witness the defendant objected to his being sworn and testifying on the ground that he was mentally incompetent to testify, and asked for an examination on the voir dire. The court denied that request on the ground that anything which might be elicited in that regard might be brought out on cross-examination, and said that defendant at the close of the plaintiff's testimony could move to strike out if he established from his testimony the fact of incompetency. An exception was taken to the ruling, which is assigned as error. No suggestion was made by counsel that he desired to call any witnesses, either lay or expert, to establish the incompetency of the witness. So far as the record discloses, he proposed to establish it merely by the examination of the witness alone. At the trial the fullest opportunity of cross-examination was afforded. At the close of the plaintiff's cross-examination the defense moved to strike out his testimony on the original ground urged when it was proposed to examine him on the voir dire. The motion was denied. "I think," said the court, "the question of the weight of his testimony is for the jury. I will take care of that in my charge." And the jury were informed that they were to consider the testimony in regard to the plaintiff's own mental condition and operations and give it such weight as they thought it deserved.

The practice of examination on voir dire may be resorted to where it is desired to test the competency of a witness to testify. The voir dire oath administered in such cases is not "to tell the truth, the whole truth, and nothing but the truth," but to give "true answers to such questions as should be put to him." These questions to be put on the voir dire examination relate solely to the competency of the witness, and the burden of this preliminary examination rests upon the party objecting to competency. In such cases, when objecting counsel ask for the administering of the voir dire oath, the application is usually granted as a matter of course. See Trussell v. Scarlett (C. C.) 18 Fed. 216. While the defendant may have been entitled as matter of right to the voir dire examination of the plaintiff, and even of other witnesses if the examination left the matter of competency in doubt (Wigmore's Evidence, vol. 1, § 497), the denial of the right does not, at least in civil cases, necessarily amount to reversible error. (Woodworth v. Brooklyn Elevated R. R. Co., 22 App. Div. 501, 505, 48 N. Y. Supp. 80.)

[9] The rule is established that a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the

questions at issue. Whether the plaintiff met that test was a question for the court. District of Columbia v. Arms, 107 U. S. 519, 2 Sup. Ct. 840, 27 L. Ed. 618; Pittsburgh, etc., R. Co. v. Thompson, 82 Fed. 720, 27 C. C. A. 333; People v. Enright, 256 Ill. 221, 231, 99 N. E. 936, Ann. Cas. 1913E, 318; Weeks v. State, 126 Md. 223, 94 Atl. 774; State v. Herring, 268 Mo. 514, 188 S. W. 169; State v. Canton, 76 Or. 51, 147 Pac. 927; State v. Hoke, 76 W. Va. 36, 84 S. E. 1054. The court's determination of the competency of a witness is not to be disturbed unless it appears clearly by the proof that his decision of the matter was erroneous. Coleman v. Commonwealth, 25 Grat. (Va.) 865, 18 Am. Rep. 711. We do not think error was committed in allowing the plaintiff's testimony to go to the jury and in allowing the jury to judge of its weight. The material question was the manner in which the shooting of Gillard by the plaintiff occurred, and a reading of Chaloner's testimony on that subject does not disclose that he had any delusions as to that occurrence or that his memory was not perfectly clear about it.

[10] The court in charging the jury instructed as follows:

"The word 'assassin' means one who kills another. I suppose it can be said treacherously. But at any rate it implies that the act of killing is intentional and it is therefore murder, and I would charge you that this statement in the paper amounts to a charge of murder against some one."

To this charge exception was taken, and the court was requested to charge as follows:

"It is for the jury to determine whether the words complained of show on their face, in the connection in which they were used, that there was an intention to impute a crime to the plaintiff, and, unless the jury so finds, the verdict must be for the defendant.

"In considering whether the words as used were intended to impute a crime or would be understood by the public as intending to impute a crime, the jury may consider whether the words of the article itself are not contradictory of the alleged charge of crime.

"The burden is on the plaintiff to show that there was an intention of imputing a crime to him and attacking his reputation. It is for the jury to determine whether the words in connection with the circumstances to which the plaintiff shows they referred were used with the purpose of imputing a crime, and if they find that they were not, they must find for the defendant."

The above requests were denied, and exception was duly taken.

The defendant relies upon Washington Post v. Chaloner, 250 U. S. 290, 39 Sup. Ct. 448, 63 L. Ed. 987, in which the court reversed a judgment in a suit for libel because the trial judge did not leave to the jury the meaning of the article complained of, and adopted the rule stated by Judge Lurton in Commercial Publishing Co. v. Smith, 149 Fed. 704, 79 C. C. A. 410. In the first of these cases the present plaintiff had brought an action against the Washington Post for libel, that paper having published a statement relating to the same tragedy which gave rise to the statement published by the present defendant. The article in the Washington Post stated that the plaintiff was in North Carolina "where he had gone to recuperate following a nervous breakdown as a result of the tragedy at his home * * * when he shot and killed John Gillard, while the latter was abusing his wife, who had taken refuge at * * * Chaloner's home." There was more

in the statement, but the essential part of the article is contained in the above passages. The plaintiff obtained a verdict for $10,000 which was affirmed by the Court of Appeals. In its opinion the Supreme Court said it was admitted that a published item saying "C. shot and killed G.," without more, would not be libelous per se. The court added that the addition of the words, "while the latter was abusing his wife who had taken refuge at Merry Mills, Chaloner's home," did not convert the statement into a definite charge of murder.

The rule which the court adopted and which was laid down in Commercial Publishing Co. v. Smith, supra, was as follows:

"A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read."

See Peck v. Tribune Co., 214 U. S. 185, 190, 29 Sup. Ct. 554, 53 L. Ed. 960, 16 Ann. Cas. 1075.

In the Commercial Publishing Co. Case the newspaper published a special dispatch from its special correspondent in words and figures as follows:

"Murderer Arrested.

"Augusta, Ark., Feb. 10th—Sheriff Marshal Patterson arrested Fred Smith, camped in a tent ten miles north of Augusta, on White river. Smith is wanted at Kennett, Mo., for killing old man F. E. Porch, the incentive being robbery. The state of Missouri offered $300, the county $200, and the citizens of Malden $600, for Smith's arrest. Smith does not deny being the man wanted, but claims he did not do the killing."

The court below charged the jury that the statement was libelous per se and actionable on its face, and denied a request to charge that it was the province of the jury to determine the meaning of the publication, and that if they should find that the article only conveyed to those who read it the meaning that the plaintiff was arrested by the sheriff on the charge of murder, that the plaintiff could not recover if they should find that he had been arrested on that charge. Judgment below was reversed, the Circuit Court of Appeals holding that the publication was not so free from reasonable doubt as to its meaning as to justify the judge in ascribing to it as matter of law the meaning put upon it by the innuendo.

The Washington Post case is distinguishable from the case before this court. In that case the words used were not libelous per se. It does not necessarily follow that one is a murderer because he has shot and killed another. In the case now before the court the words used were libelous per se.

The publication in defendant's newspaper charged that the person reflected upon was an "assassin." The definition of that word given by Webster is:

"One who kills, or attempts to kill, by surprise or secret assault; one who treacherously murders any one unprepared for defense."

And to "assassinate" is:

"To·kill by surprise or secret assault; to murder by treacherous violence. To assail with murderous intent; hence, by extended meaning, to maltreat exceedingly."

So that to say of one that he is an assassin is to say not that he has killed some one, as in the Washington Post case, which may or may not be murder, but that he has committed or attempted to commit murder. And in the present case there were no explanatory or qualifying words, as in the Commercial Publishing Co. case, which might lead the readers of the paper to understand that the person was not asserted to be a murderer but was only accused of having committed the crime. In the present case the published statement refers to the person involved, not as being accused of being an assassin, but it refers to him as actually an assassin. When the meaning of the statement is so unambiguous as reasonably to bear but one interpretation, it is for the judge to say whether that signification is libelous or not. It is only when it is capable of two meanings, one of which would be libelous and the other not, that it is the duty of the judge to leave it to the jury to say, under all the circumstances connected with its publication, which of the two meanings would be given to it by those by whom it is read. Townshend on Libel and Slander, §§ 281, 286. We find no error in the court's instruction that the statement published in defendant's newspaper amounted to a charge of murder. The statement is unambiguous, and it reasonably bears but one interpretation.

[11] This brings us to the question of damages. The defendant requested the court to charge:

"No special damages being alleged or proved in this case, and the character of the plaintiff having been vindicated by the coroner's jury, this jury can only award him nominal damages."

This was denied.

Defendant also requested the court to charge:

"Punitive damages, that is to say, a sum in addition to damages, assessed as a punishment, will not be allowed in this case."

This also was denied.

Defendant also requested the court to charge:

"Unless the jury finds that the plaintiff was injured in his character or reputation by the article complained of, the verdict must be for the defendant."

This also was denied.

The charge of the court on the subject of punitive damages, and to which defendant excepted, was as follows:

"If you find that the article was published recklessly and is untrue and without any investigation, you may also award as other damages, to prevent a repetition of the offense, what are known as punitive or vindictive damages, which in your judgment you may think proper. You are to judge all this question of damages fairly and temperately, without passion, as

business men and reasonable citizens. You are not obliged, if you should find that he was damaged, to allow any punitive damages whatever. That is a matter which under the law rests in your sound discretion and is to be guided largely by what you think are the requirements of justice in preventing a repetition of this kind of thing if you find it was a wrong."

In these refusals to charge and in the charge as actually given there was no error. It is established beyond question that punitive damages may be awarded in an action for libel either when the publication was prompted by actual malice, or the defendant has acted with recklessness or carelessness. Post Publishing Co. v. Butler, 137 Fed. 723, 71 C. C. A. 309; Duke v. Morning Journal Association (C. C.) 120 Fed. 860; Times Publishing Co. v. Carlisle Co., 94 Fed. 762, 36 C. C. A. 475; Smith v. Matthews, 152 N. Y. 152, 46 N. E. 164; Holmes v. Jones, 147 N. Y. 59, 41 N. E. 409, 49 Am. St. Rep. 646; Haines v. Schultz, 50 N. J. Law, 481, 14 Atl. 488; Newman v. Stein, 75 Mich. 407, 42 N. W. 956, 13 Am. St. Rep. 447; Orth v. Featherly, 87 Mich. 315, 49 N. W. 640; Neeb v. Hope, 111 Pa. 145, 2 Atl. 568; Folwell v. Providence Journal Co., 19 R. I. 551, 37 Atl. 6; Westerfield v. Scripps, 119 Cal. 607, 51 Pac. 958; Turner v. Hearst, 137 Cal. 232, 70 Pac. 18. There is no claim in this case that defendant acted with malice, but it is alleged that it acted recklessly or carelessly. In such cases punitive damages are not allowed as a matter of right, but their recovery rests in the sound discretion of the jury. Bergmann v. Jones, 94 N. Y. 51. Punitive damages are allowed on the ground of public policy and not on the ground that the plaintiff has any right to the money. That goes to him simply because assessed in his suit. Broughton v. McGrew (C. C.) 39 Fed. 672, 5 L. R. A. 406.

Certain publications are actionable per se, by which is meant that an action can be maintained against one who published them, and damages may be recovered without proof of actual injury, as injury is presumed. The publication of a charge that a man is an assassin is, if anything can be, libelous per se, without averment or proof of special damage. The gist of an action for libel is the injury which the plaintiff has suffered because of the wrongful publication, and he is entitled to recover damages commensurate with his injury. And in the case of a publication libelous per se a plaintiff is entitled to general damages as compensation for those injuries which the law presumes must naturally and necessarily result from the publication. He recovers under the head of general damages compensation for mental suffering and injury to his feelings and for any injury to his character and reputation.

[12] The fact that a libel has been published after a man has been vindicated of the charge made therein tends to aggravate rather than to mitigate the damages. The wrong done by the publication is not excused nor the right to damages lost by the fact that the libel is not believed. Bishop v. Journal Newspaper Co., 168 Mass. 327, 47 N. E. 119.

There are 19 assignments of error in the record in this case. We have examined them with care, but do not find in any of them reversible error.

Judgment affirmed.