## NATIONAL REFINING CO. v. BENZO GAS MOTOR FUEL CO.*

Circuit Court of Appeals, Eighth Circuit.
May 23, 1927.

No. 7563.

**1. Libel and slander ⟺73—A corporation may maintain action for libel.**

A corporation, as an individual, may maintain an action for libel.

**2. Libel and slander ⟺73—Published false statements may constitute libel per se against corporation.**

Published false statements may constitute libel per se against a corporation as against an individual.

**3. Libel and slander ⟺73—Libels against corporation are confined to attacks injuring property, credit, or business.**

Legal principles constituting the law of libel are the same, whether corporations or individuals are involved, except that libels against a corporation are confined to attacks which injure the property, credit, and business thereof.

'Rehearing denied September 14, 1927.

**4. Libel and slander ⟺21—A libelous article need not necessarily name party libeled.**

It is not necessary that party libeled should be named in libelous article; the question whether an article is libelous, and whether it has application to a particular plaintiff, being entirely distinct.

**5. Libel and slander ⟺80—Complaint alleging that "defendants falsely and maliciously published certain false and libelous printed statements in reference to plaintiff and plaintiff's certain product," etc., held to sufficiently show application of defamatory matter to plaintiff, in view of Missouri statute (Rev. St. Mo. 1919, § 1263).**

In action for libel by manufacturer of motor fuel, consisting of gasoline and benzol, allegation that defendants "falsely and maliciously published certain false and libelous printed statements in reference to plaintiff and plaintiff's certain product, consisting of a mixture of gasoline and benzol as a motor fuel, in the following manner," etc., held sufficient to show application of defamatory matter to plaintiff, in view of Rev. St. Mo. 1919, § 1263, declaring it unnecessary to state in petition any extrinsic facts showing application to plaintiff of the defamatory matter out of which the action arose.

**6. Libel and slander ⟺123(5)—Whether alleged libelous statements refer to plaintiff and its motor fuel held under evidence for jury.**

Question whether alleged false libelous printed statements refer to plaintiff and plaintiff's motor fuel held, under evidence, for jury.

**7. Libel and slander ⟺9(7), 89(1)—Printed statements condemning mixture of benzol and gasoline as motor fuel, as applied to manufacturer of such fuel, held not libelous per se, nor actionable, in absence of allegation and proof of special damage.**

Printed statements, published and circulated by gasoline manufacturer, condemning mixture of gasoline and benzol as motor fuel, and pointing out bad effects which would follow from its use, as applied to corporation manufacturing a benzol gasoline motor fuel, held not libelous per se, nor actionable, unless special damages were alleged and proven.

**8. Libel and slander ⟺9(7)—Defamatory statements affecting goods of tradesmen are classified (1) as statements including matter libelous to vendor or producer; (2) statements merely as to quality of goods of another; (3) statements amounting only to assertion of superiority of one's goods over rival's.**

English and American courts recognize three different classes of defamatory statements in reference to goods or products of tradesmen: (1) Statements in reference to goods or products, which include libelous words in reference to vendor or producer, and impute to him fraud, deceit, dishonesty, or reprehensible business methods; (2)· statements where alleged libelous matter is made merely as to quality of goods or product of another; (3) statements amounting to no more than assertions by one tradesman that goods are superior to those of his rival.

**9. Libel and slander ⬤⤳9(7)—Statement directed against goods of corporation will not be held libelous per se as to corporation, unless alone it imputes fraud, deceit, dishonesty, or reprehensible conduct to corporation.**

Where alleged libelous publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without extrinsic evidence it imputes to corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to such product.

**10. Libel and slander ⬤⤳123(2)—Construction of unambiguous words in alleged libel is for court.**

Construction of unambiguous language contained in alleged libelous statement is for court.

**11. Libel and slander ⬤⤳19—Unambiguous words, contained in alleged libel, should be given ordinary meaning.**

Unambiguous words, contained in alleged libelous statement, should be given their plain, ordinary meaning.

Lewis, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Action by the Benzo Gas Motor Fuel Company against the National Refining Company. Judgment for plaintiff, and defendant brings error. Reversed, and cause remanded.

I. J. Ringolsky, of Kansas City, Mo., T. H. Hogsett, Frank H. Ginn, and W. B. Cockley, all of Cleveland, Ohio, and M. L. Friedman and Wm. G. Boatright, both of Kansas City, Mo. (Tolles, Hogsett & Ginn, of Cleveland, Ohio, Ringolsky, Friedman & Boatright, of Kansas City, Mo. and W. B. Cockley, of Cleveland, Ohio, on the brief), for plaintiff in error.

Blatchford Downing, of Kansas City, Mo. (H. L. McCune and R. B. Caldwell, both of Kansas City, Mo., on the brief), for defendant in error.

Before LEWIS and BOOTH, Circuit Judges, and PHILLIPS, District Judge.

BOOTH, Circuit Judge. This is a writ of error to a judgment entered after verdict against plaintiff in error, hereafter called defendant. The action was originally brought in the state circuit court of Jackson county, Missouri, and was duly removed to the United States District Court for the Western District of Missouri on the ground of diversity of citizenship. The action was one for damages on account of an alleged libel published by defendant.

The complaint alleged in substance as follows: That plaintiff was, and for several years prior to September 1, 1924, had been, engaged in Jackson county, Missouri, and elsewhere, in the business of producing and selling a motor fuel consisting of a mixture of benzol and gasoline, under the trade-name of "Benzo Gas"; that plaintiff during said times was the only producer and seller of such a mixture in Kansas City and vicinity, and had built up a profitable business therein; that about September 1, 1924, at Kansas City, defendant maliciously published certain false and libelous statements in reference to plaintiff and plaintiff's said product; that the publication was made by distributing to numerous users of motor fuel a leaflet, a copy of which was attached to the complaint (the leaflet is set out in the margin [1]); that cer-

---

[1] "This Will Interest You!

"[During the period of the recent war, the Government urged the conservation of gasoline, and advised that benzol, which was being manufactured from coal, be mixed with gasoline so as to conserve the gasoline, which would be used in the aeroplanes, motor trucks, and armored cars operated in conducting the war. (Take note that the Government would not use anything but pure gasoline. They would not use benzol.)]

"Germany had plenty of Benzol manufactured from coal, but no gasoline. The failure of their aeroplanes and motor-driven implements of war was due to the fact that they had no gasoline and depended upon Benzol.

"Straight benzol, or [a mixture of benzol and gasoline or a mixture of benzol and kerosene oil is not a proper fuel for an automobile, tractor or truck for the reason that when benzol is ignited by the electric spark, it explodes instantaneously. The entire power of the explosion being instantaneous, it is delivered on one spot of all the bearings in the motor and acts the same as if a sledge hammer were taken and a severe blow delivered on one spot at the rate of from twelve hundred to three thousand sledge hammer blows per minute. The result is that the bearings become egg-shaped, resulting in repairs in the form of new bearings.

"The contrary takes place if *White Rose Gasoline, or any other* pure gasoline is used.] When White Rose Gasoline is received in the cylinder of a motor, and is ignited, it burns practically the length of the stroke, delivering power from the start until the stroke of the motor is finished, in that way delivering the force of the explosion on fifty per cent. of the surface of the bearings, so that the bearing is not impaired.

"[Benzol, or a mixture of benzol and gasoline, or a mixture of benzol and kerosene, causes corrosion and pitting of the cylinders and valves, likewise overheats the engine, causing the valves to become exceedingly hot, necessitating frequent grinding of the valves in order to get proper compression due to the corroding and warping.]

"[These mixtures, used in cold weather,

tain statements therein contained (those inclosed in brackets, except the italicized words, in the marginal leaflet) were false; that the statements were published maliciously by defendant for the purpose of discouraging users and prospective users of plaintiff's product from purchasing and using the same, and for the purpose of injuring plaintiff and its said product, and the reputation they had acquired by reason of the excellence of said product; that by reason of the premises plaintiff had been damaged in its business and reputation and the reputation of its product in the sum of $25,000; and, because the statements were maliciously made, plaintiff was entitled to punitive damages in the further sum of $50,000.

The amended answer alleged the truth of the statements mentioned, and denied the other allegations of the complaint. At the trial plaintiff introduced its evidence and rested. Defendant demurred to the evidence. The demurrer was overruled. Defendant stood on its demurrer, and declined to introduce any evidence, but requested an instruction directing a verdict for defendant. This was refused. The jury returned a verdict of $1 actual damages and $10,000 punitive damages.

The evidence introduced by plaintiff tended to prove the following facts:

Plaintiff owned 4 or 5 filling stations in Kansas City where it sold Benzo Gas; also gasoline, oils, and naptha. It also sold Benzo Gas to upwards of 70 filling stations in and around Kansas City. It made the Benzo Gas

cause trouble in the gasoline running from the supply tank to the carburetor. Unmixed benzol starts to flake and congeal at 40 temperature, and if mixed with kerosene oil or gasoline, forms flakes in the small delivery pipe to the carburetor, often causing it to plug up.]

"You have none of these bad effects when White Rose Gasoline is used. It is a pure gasoline, made with a view of furnishing the greatest power in a motor, with no ill effects, and all engineers who have designed motors for automobiles, tractors, aeroplanes, etc., have built the motors, having in mind the use of only pure gasoline.

"No engineer has designed a motor for burning anything other than gasoline. Therefore, why go contrary and use other fuels for which the motor was not designed?

"Dopes advertised to increase the efficiency of gasoline, to prevent the formation of carbon and other claims are nothing but dopes and should not be used. They are harmful to the motor. They do not increase the efficiency of good gasoline, and even when used with mixtures of gasoline and kerosene or low grade gasolines, they are more harmful than the material used. You can take several different acids and introduce them in a motor, and they will eat the surface of the iron until it is clean and bright, but they are destroying the motor.

"For a period of forty-two years, we have manufactured White Rose Gasoline, first for the gasoline stove, then the gasoline flare torch, and lights; later for the automobile, aeroplane or tractor. It is an honestly made gasoline, and the reputation of the company is back of it and has been back of it for a period of forty-two years.

"We know that if you will use White Rose Gasoline, not only will your car perform better and deliver more horsepower, but it will reduce the cost of repairs and depreciation of the car. If you save a few cents per gallon in buying gasoline, you will pay many times as much as you should in repairs.

"Use White Rose Gasoline for a month. You will prove what we have said above. You will find that you will use no other gasoline after giving it a thorough trial. Spark plugs will not have to be cleaned. The power is delivered on one-half of the surface of the bearings. The motor will respond more quickly, In fact, White Rose Gasoline is the last word in power and economy for use in an automobile, tractor, truck, aeroplane or gas engine.

"When only the price of gasoline is considered, and a poor or low grade gasoline used, it is the most expensive. It is more expensive than White Rose Gasoline. Poor or low grade gasoline is not entirely consumed in the motor. When it is taken into consideration that a motor makes from twelve hundred to three thousand revolutions per minute a part of the poor or low grade gasoline is not consumed. Consequently, no benefit is derived but much damage done by the heavy ends being forced down the sides of the cylinders, which dilutes the lubricating oil in the crank case, killing its lubricating properties, and that which does not pass down the cylinders is either thrown out of the exhaust or collects on top of the cylinders, forming carbon.

"Every bit of White Rose Gasoline that is taken into the cylinders furnishes power, and is all consumed.

"The next thing to be considered is the proper lubrication of the motor. An engineer recently, writing for a magazine, estimated that on account of inattention to the proper kind of gasoline used and the proper kind of lubricating oil, there were expended during the period of one year, in repairs, over four hundred million dollars. The figure is appalling, and yet, when it is considered how absolutely necessary it is to have proper lubrication, so that the bearings of the motor will not wear and so that the rings will not wear and reduce the compression, and how little attention is paid to the kind of oil that is used or the kind of gasoline, four hundred million dollars in repair bills do not look so much out of the way.

"Enarco Motor Oil has forty-two years of experience back of it by laboratories and workmen that know how to build the best lubricant there is. We put our name to it, which means our reputation, and the use of Enarco Motor Oil will insure absolutely proper lubrication.

"Have the oil changed in the crank case of the motor every five hundred miles.

"We do this free at any White Rose Gasoline station, charging only for the Enarco Motor Oil used.

"You will be pleased with this service.
"The National Refining Co.
"42 Years' Experience."

which it sold. There was no secret and no patent process in making Benzo Gas. It was simply a mixture of benzol and gasoline in varying proportions, and usually a small quantity of naptha. Benzol is a product ordinarily derived from the distillation of bituminous coal. Such mixtures have been in common use for some years in certain parts of the United States, and are known under various names, such as "Benzoline" and "Benzol Gasal." Plaintiff was the only producer of the product in the vicinity of Kansas City. Defendant was in the business of selling petroleum products, such as gasoline, kerosene, and oils. White Rose gasoline was one of the products. It had refineries in Ohio and Kansas. It did business in upwards of 20 states. Its home office was in Cleveland, Ohio. It was operating at the time of the alleged libel 20 or 30 filling stations in Kansas City.

The leaflet constituting the alleged libel was prepared by the president of defendant company as part of an educational campaign by defendant. About 150,000 of the leaflets were printed. They were distributed by salesmen of the company at the various filling stations of the company in the territory mentioned, including the filling stations at Kansas City. One of the filling stations in that city was just across the street from a Benzo Gas filling station. The statements in the leaflet were composed by the president of defendant company from his own information, derived from forty years experience in the oil business, from talks with automobile drivers, and from reading numerous articles on the effects of the use of benzol and gasoline mixtures in internal combustion engines. He had had no personal experience with benzol or benzol and gasoline blends. Shortly after the leaflet was distributed in Kansas City, plaintiff published an advertisement in one of the city papers, referring to the leaflet, denying its statements, and offering to participate in a test to be proposed by defendant, to determine the truth or falsity of the statements. In default of such a test, a retraction of the statements was demanded. A copy of this advertisement was mailed to the local manager of defendant at Kansas City. No answer was received.

The evidence of plaintiff further tended to prove that the statements above mentioned contained in the leaflet, except possibly the first, were untrue. The assignment of errors covers a number of points, but the ones most strongly stressed by defendant are, (1) that the statements complained of were not libelous per se; (2) that if the statements, though not libelous per se, were nevertheless actionable, yet recovery could be had only by alleging special damages in the complaint and proving the same, neither of which requisites was fulfilled; (3) that a judgment for punitive damages could not stand unless a cause of action was established for actual damages.

The second and third propositions are not seriously contested by plaintiff, if we understand its position; but the first proposition is strenuously denied. The vital question in the case, therefore, is: Were the statements libelous per se? The complaint was evidently drawn on the theory that they were; and such was the contention of plaintiff, both in the court below and in this court. [1, 2] It is apparent from the statement of facts that the dispute narrows itself down mainly to a discussion of the question: under what circumstances a defamatory publication concerning the goods or product of a vendor or manufacturer may also constitute a libel per se concerning the vendor or manufacturer himself. We shall assume without discussion that a corporation may maintain an action for libel; also that published false statements may constitute libel per se against a corporation. The authorities cited hereafter in which corporations were plaintiffs show that these propositions are no longer open to question.

[3] Furthermore, the legal principles constituting the law of libel are the same whether corporations or individuals are involved. But there are recognized distinctions between the application of those principles to individuals and their application to corporations, growing largely out of the differences between natural and artificial persons. For example, a corporation is incapable of committing certain acts, especially some crimes, which an individual would be capable of committing; and again, a corporation has no merely personal reputation in the sense that an individual has. Libels against a corporation are, therefore, confined to attacks which injure the property, the credit, the business of the corporation. South Hetton Coal Co. v. Northeastern News Ass'n, 9 R. 240; Memphis Tel. Co. v. Cumberland Co. (C. C. A.) 145 F. 904, 906; Security Benefit Ass'n v. Daily News Pub. Co., 299 F. 445 (C. C. A. 8), and cases cited; Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories, 17 F. (2d) 255 (C. C. A. 8).

While the instant case illustrates those distinctions to some extent, yet its determination is not vitally dependent thereon. Defendant contends that the statements in the leaflet do not constitute a libel per se against plaintiff (a) because nowhere in the leaflet is

plaintiff mentioned, nor the plaintiff's product, Benzo Gas; (b) because in any event the statements disparage merely the property or product of plaintiff, and not plaintiff itself.

[4, 5] We think there is no merit in the first contention. It is not necessary that the party libelled should be named in the libelous article. Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, are entirely distinct questions, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proofs supporting proper allegations in the complaint. Those proofs may consist either of the article itself, or of extrinsic evidence. In the case at bar the allegation of the complaint was: "Defendants falsely and maliciously published certain false and libelous printed statements in reference to plaintiff and plaintiff's certain product consisting of a mixture of gasoline and benzol as a motor fuel in the following manner. * * * "

We think this allegation was, sufficient in view of section 1263, Revised Statutes of Missouri 1919, which reads as follows: "In an action for libel or slander, it shall not be necessary to state in the petition any extrinsic facts, for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it shall be sufficient to state, generally, that the same was published or spoken concerning the plaintiff; and if such allegation be not controverted in the answer, it shall not be necessary to prove it on the trial; in other cases it shall be necessary."

[6] In the present case the allegation in question was controverted in the answer; but there was substantial evidence to the effect that persons into whose hands the leaflets fell understood that plaintiff's product was aimed at. It was therefore for the jury to determine whether the article was really directed against plaintiff's product. International Text-Book Co. v. Leader Co. (C. C.) 189 F. 86, 89; LeFanu v. Malcomson, 1 H. L. Cas. 637; Peck v. Tribune Co., 214 U. S. 185, 29 S. Ct. 554, 53 L. Ed. 960, 16 Ann. Cas. 1075; Pavesich v. New England Ins. Co., 122 Ga. 190, 50 S. E. 68, 69 L. R. A. 101, 106 Am. St. Rep. 104, 2 Ann. Cas. 561.

[7] Assuming, therefore, that plaintiff's product was aimed at, the crucial question remains: Were the statements libelous per se in respect to plaintiff itself? In order to answer this question correctly, let us examine a few typical cases.

In Burnet v. Wells, 12 Mod. 420, the following words were used in reference to a tradesman, "He has nothing but rotten goods in his shop." It was held that these words were actionable per se. Though the attack was directly on the goods, it was also an attack on the shopkeeper in the conduct of his business.

In Evans v. Harlow, 13 L. J. N. S. (Q. B.) 120, the complaint stated the plaintiff was the inventor of a certain design, and manufactured goods with the design on; that plaintiff had for sale certain tallow syphons or lubricators; that defendant published an article concerning plaintiff, which was false, malicious, and defamatory, to wit:

" 'This is to caution parties employing steam power, from a person (meaning the plaintiff) offering what he (meaning the plaintiff) calls self-acting tallow syphons or lubricators (meaning the said design, and meaning the said goods and articles which the plaintiff had so sold and had on sale as aforesaid), stating that he (meaning the plaintiff) is the sole inventor, manufacturer, and patentee, thereby monopolizing high prices at the expense of the public, Robert Harlow (meaning himself, the defendant), brass founder, Stockport, takes this opportunity of saying that such a patent does not exist, and that he (meaning the defendant) has to offer an improved lubricator, which dispenses with the necessity of using more than one to a steam engine, thereby constituting a saving of 50 per cent. over every other kind yet offered to the public. Those who have already adopted the lubricators (meaning the said design of the plaintiff, and meaning the goods and chattels which the plaintiff had so sold and had on sale as aforesaid) against which R. H. (meaning himself, the defendant) would caution, will find the tallow is wasted, instead of being effectually employed, as professed.' "

The complaint further alleged that by reason of the premises plaintiff was injured in his credit, reputation, and circumstances, and was prevented from making sales which he otherwise would have made. No special damage was pleaded.

On demurrer the complaint was held bad, first, because the complaint did not properly connect the design with the tallow syphons; second, because there was no attack made on plaintiff, but only on his goods, and no special damage was pleaded. Lord Denman, C. J., said:

"The whole gist of the libel is that certain articles called lubricators are not good articles. We cannot put a libelous construction

upon words, merely because they are said in the declaration to be written falsely and maliciously. If we hold this to be a libel, then every tradesman who publishes that his goods are better than those of some other tradesman will be liable to an action. True, the defendant cautions the public; but the caution is confined to the goods, and conveys no personal imputation on the plaintiff."

Patteson, J., said: "It comes to a mere caution, that goods which the plaintiff sells will not answer their purpose, with an absence of special damage."

Wightman, J., said: "* * * Then it says, that the parties using these lubricators will find that the tallow is wasted; and there is no allegation that the plaintiff knew that the articles were of that character, i. e. that they would not answer. The absence of any personal imputation on the plaintiff, distinguishes the case from that which is most like the present, namely, that of Harman v. Delany [2 Str. 898]. The libel there stated, that the plaintiff was no artist: here there is no statement of the kind, and there is no special damage."

Another leading case is Western Counties Manure Co. v. Lawes Chemical Manure Co., Law Rep. 9 Ex. 218. In that case the complaint alleged that both plaintiff and defendant were manufacturers and sellers of artificial manures; that defendant, intending to injure plaintiff, falsely and maliciously published concerning plaintiff as such manufacturer, the following:

" 'Chemical Laboratory, University of Glasgow, January 29, 1873—Dear Sir: I inclose herewith analyses of your four samples of manure, which differ much in quality. They are all mixtures, and do not consist of bones and acid alone. No. 2 (meaning thereby the defendants' artificial manures) is much the best, and seems to contain some kind of phosphatic guano. No. 4 (meaning thereby the plaintiffs' said artificial manures) appears to contain a considerable quantity of coprolites, and is altogether an article of low quality, and ought to be the cheapest of the four. * * *' "

The complaint continued: "Meaning thereby that the said artificial manures so manufactured, sold, and traded in by the plaintiffs were artificial manures of an inferior quality to the said artificial manures, and especially were of an inferior quality to the said artificial manures of the defendants; whereas, in truth and in fact, the said artificial manures so manufactured, sold, and traded in by the plaintiffs were not of an inferior quality, and specially were not inferior in quality to the said artificial manures of the defendants. And by reason of the premises [here followed an allegation of special damage]."

On demurrer to the complaint, judgment went for plaintiff. Bramwell, B., said:

"* * * It is not libeling an article to say that it is an article of low quality and ought to be cheaper than others. * * * The declaration goes on and says, 'meaning thereby that the artificial manures so manufactured and traded in by the plaintiffs were artificial manures of inferior quality to other artificial manures, and that they especially were of inferior quality to the artificial manures of the defendants.' I think if it stopped there it would not be the subject-matter of an action, even with special damage resulting from it, because I do not see that it is injurious to an article to say that it is of inferior quality. * * * But what makes the action maintainable is the allegation that follows: 'Whereas, in truth and in fact, the said artificial manures so manufactured and traded in by the plaintiffs were not of inferior quality, and were not inferior in quality to the said articles of manure of the defendants;' and by reason of the premises, certain persons, who, if they had not been told that which was untrue, would have continued to deal with the plaintiffs, are alleged to have ceased to deal with them. So that it appears there was a statement published by the defendants of the plaintiffs' manufacture, which is comparatively disparaging of that manufacture, which is untrue so far as it disparages it, and which has been productive of special damage to the plaintiffs. * * * On the general principle, therefore, that an untrue statement disparaging a man's goods, published without lawful occasion, and causing him special damage, is actionable, we give our judgment for the plaintiffs."

Pollock, B., said:

"This action is, I think, in the nature of an action of slander of title, and comes within the general rule laid down as to such actions in Comyn's Digest, where it is said that an action lies when special damage is shewn. Com. Dig. tit. Action on Case for Defamation, G, 11. The only question, therefore, that seems to arise is, what is the fair intention of the words? It is alleged that the defendants were contriving and intending to injure the plaintiffs in their business, and that they falsely and maliciously printed and published the words in question. * * * Therefore we have it stated that without legal occasion, without any necessity, the defendants have used language of and concerning

the plaintiffs' goods which not only are false, but are such as to injure the plaintiffs in their business, and special damage is alleged. When all these things concur it seems to me a good cause of action is disclosed. With reference to the cases that have been cited, Malachy v. Soper [3 Bing. N. C. 371], Evans v. Harlow [5 Q. B. 624], and Young v. Macrae [3 B. & S. 264], I would only observe that, in the two first-mentioned cases, there is no allegation of special damage."

In White v. Mellin, 11 R. (H. L.) 141, it was again held that in order to entitle a plaintiff to maintain an action for damages for publication of statements disparaging his goods, it must be shown that special damage was occasioned. Evans v. Harlow was cited and approved, and it was said that the only distinction between that case and the Western Counties Manure Co. Case was that in the latter case special damage was alleged, whereas in the former it was not. Lord Watson stated the law as follows (page 152):

"In order to constitute disparagement which is, in the sense of law, injurious, it must be shown that the defendant's representations were made of and concerning the plaintiff's goods, that they were in disparagement of his goods and untrue, and that they have occasioned special damage to the plaintiff. Unless each and all of these three things be established, it must be held that the defendant has acted within his rights and that the plaintiff has not suffered any legal injuria."

In the case of Thomas Hubbuck & Son v. Wilkinson, Heywood & Clark, 68 L. J. N. S. (Q. B.) 34, a wholesale oil merchant and paint manufacturer brought suit for libel against a rival concern in the same business. The alleged libel consisted of a copy of a "report" by a firm of builders "on a trial of 'Bell Brand Genuine White Zinc' " (manufactured by defendants) "with Hubbuck's 'Patent White Zinc' " (manufactured by plaintiff). The complaint, after setting out the report, alleged as follows:

"By the said words the defendants meant that the white zinc of the defendants, was superior to that of the plaintiffs, or that it was at least equal thereto, at a much cheaper price, and that the white zinc of the plaintiffs was adulterated and not genuine, and that persons purchasing white zinc from the plaintiffs would do better by purchasing that of the defendants. The said report was untrue, and the alleged trials had not been made, or fairly made, or made with the alleged results."

20 F.(2d)—49

No special damage was alleged. From an order striking out plaintiffs' statement of claim (one of the substitutes for demurrer), unless the same were amended by averring special damage, appeal was taken.

The cases of Evans v. Harlow and White v. Mellin were cited and approved, and the case of Western Counties Manure Co. distinguished. It was further held that since the alleged libelous statement, including the report, amounted to no more than the assertion by one rival tradesman that his goods were superior to those of the other, no action would lie, though the statements were false and malicious, and even though special damage had been pleaded.

It is apparent from the foregoing cases that in the English courts three different classes or grades of defamatory statements in reference to the goods or products of tradesmen are recognized:

[8] (1) Those where, though the alleged libelous statement is made in reference to goods or product, there are also included libelous words in reference to the vendor or producer, which impute to him, in connection with the goods or product, fraud, deceit, dishonesty, or reprehensible business methods. Burnet v. Wells, supra.

(2) Those where the alleged libelous statement is made merely as to the quality of the goods or product of another. In these cases special damage must be alleged and proved, or no recovery can be had. Evans v. Harlow, supra; White v. Mellin, supra; Western Counties Manure Co. v. Lawes Chemical Manure Co., supra. A very humorous case of this class, arising as far back as the reign of Charles the First, is found in March's Reports, page 59, Dickes v. Fenne.

(3) Those where the alleged libelous statements amount to no more than assertions by one tradesman that his goods are superior to those of his rival. Here no recovery can be had, though the statements are false and malicious, and though special damage is alleged. Thomas Hubbuck & Son v. Wilkinson, Heywood & Clark, supra.

These same distinctions of classes or grades are recognized in the decisions of American courts.

In Larsen v. Brooklyn Daily Eagle, 165 App. Div. 4, 150 N. Y. S. 464, the alleged libelous article stated that a child ate some of plaintiff's ice cream, was shortly thereafter seized with convulsions, and died; that it was believed the ice cream was responsible; that four other children had been taken ill after eating ice cream in the same place; that

the ice cream was made by plaintiff. On demurrer it was held that the statements were libelous per se. The court said that the published article was more than an attack upon the goods or product—it was a reflection upon the honesty and integrity of the manufacturer.

This case falls into the first class with Burnet v. Wells, supra. See, also, Ohio & M. Railway Co. v. Press Pub. Co. (C. C.) 48 F. 206; American Book Co. v. Gates (C. C.) 85 F. 729; Sternberg Mfg. Co. v. Miller, etc., Mfg. Co., 170 F. 298 (C. C. A. 8).

Wilson v. Dubois, 35 Minn. 471, 29 N. W. 68, 59 Am. Rep. 335, was a case where defamatory statements were published of plaintiff's race horse, but the complaint did not set out special damages. It was held that the complaint was demurrable on that ground.

In Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories, supra, the complaint alleged that plaintiff was a manufacturer and seller of a medical preparation for stock, and had built up a profitable business; that defendant was engaged in the manufacture and sale of live stock remedies and also published a trade journal; that defendant published in its journal, what purported to be an analysis of plaintiff's medical preparation, ending with the statement: " 'Sample is brown sugar and bran.' " Following this were the statements:

" 'This analysis corresponds in all respects to the analysis of samples of this product sent to our laboratory, which only goes to prove that P. T. Barnum's statement 50 years ago can be applied even at the present time. We understand that the Farm Bureau of North Dakota is going to put on a publicity campaign to protect the live stock owners against expenditures for such products. This is one piece of work that the Farm Bureau can handle in an effective way.' "

The complaint further alleged:

"That by the publication of said words and article, the defendant intended to assert and to be understood as asserting and by the readers of said journal and publication was in fact understood as asserting that the said remedy manufactured and sold by this plaintiff was worthless, and would not cure the disease of abortion among cows and sows, and that the said remedy was a fraud and a humbug, and that this plaintiff was knowingly engaged in the business of cheating and defrauding the public and all persons who bought said remedy for the purpose for which it was manufactured and sold, and that the Farm Bureau of North Dakota was going to engage in a publicity campaign to expose said fraud and to protect live stock owners against buying such worthless products as plaintiff was manufacturing and selling, and by so doing the said Farm Bureau would be doing a good service to all those who might be victimized by buying plaintiff's said remedy."

"That the said article published by the defendant is misleading, false, defamatory and malicious, and by means of said publication the plaintiff has been greatly injured in its good name and business reputation, and has suffered great loss in its business and credit."

On the trial, following the opening statement of counsel, the case was dismissed, on the ground that neither the complaint nor counsel's statement set out any cause of action. The grounds of the dismissal were that the article was not libelous per se, and that special damage was not alleged. The judgment of dismissal was affirmed by this court. In the course of its opinion the court said:

"A publication which merely disparages goods or property by making accusations against the quality, purity or value of the same is not actionable per se. Victor Safe & Lock Co. v. Deright (C. C. A. 8) 147 F. 211, 8 Ann. Cas. 809; 36 C. J. p. 1169, § 39; 37 C. J. p. 130, § 594; 17 R. C. L. p. 455, § 217."

The Wilson Case and the Erick Bowman Co. Case fall into the second class with Evans v. Harlow, supra; Western Counties Manure Co. v. Lawes Chemical Manure Co., supra; White v. Mellin, supra. See, also, Victor Safe & Lock Co. v. Deright, 147 F. 211, 8 Ann. Cas. 809 (C. C. A. 8); Hopkins C. Co. v. Read Drug & C. Co., 124 Md. 210, 92 A. 478.

Johnson v. Hitchcock, 15 Johns. (N. Y.) 185, was an action for damages for representing that plaintiff's ferry was not as good as a rival ferry. It was held no action would lie. This case falls into the third class, with the case of Thomas Hubbuck & Son v. Wilkinson, Heywood & Clark, supra. See, also, Nonpareil Cork Mfg. Co. v. Keasbey & Mattison Co. (C. C.) 108 F. 721.

The cases above discussed have been selected as illustrative of their respective classes. Citation of cases under each of the classes might be multiplied indefinitely. We do not wish to be understood as holding that the several foregoing classes are separated from each other by clear and distinct lines. Such

is not the fact. Nevertheless the distinctions are real, though not always easy of application to particular states of facts.

[9] The result of the above-cited cases appears to be that, where the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without the aid of extrinsic evidence it imputes to the corporation, fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.

Viewed in the light of the principles announced in the foregoing cases, into what class does the case at bar fall? Not into the third, because, plainly, the statements were not confined to disparaging comparison between the product of plaintiff and that of defendant. After careful consideration we have concluded that it falls into the second class, with Evans v. Harlow, supra, and the Erick Bowman Co. Case, rather than into the first class, with Burnet v. Wells, supra, and Larsen v. Brooklyn Daily Eagle, supra.

There is a striking similarity between the facts in the Erick Bowman Company Case and the case at bar. In both the publication was made by one manufacturer and seller of a product against another manufacturer and seller of products in a similar line of business. In both publications the main attack was against the product manufactured and sold. In neither publication was it stated that plaintiff was engaged in the manufacture or sale of the product.

There are differences, but they are not vital. In the Erick Bowman Company Case the statement indicated that the product was harmless, and merely a worthless humbug, but it was not stated that plaintiff knew that it was a worthless humbug. In the case at bar the statements indicate that the product attacked was harmful in its use; but it was not stated that plaintiff knew that such was the case, nor that the character of the product was such that plaintiff must have known that it would produce harm.

Plaintiff's contention is that the statements complained of amount to "a charge that plaintiff is 'willingly and knowingly manufacturing a product that is unfit for the purpose it is recommended.' It does in fact impute moral turpitude to plaintiff in foisting an article of the characteristics described by defendant upon the public."

[10, 11] We cannot agree with this contention. The words used in the statements in the case at bar were not ambiguous. Their construction was therefore for the court. New York Evening Post Co. v. Chaloner (C. C. A.) 265 F. 204, 219. They should be given their plain, ordinary meaning. When so construed we find nothing in them which reflects on the honesty or integrity of plaintiff; nothing that imputes to it fraud or deception; nothing which indicates reprehensible methods in the conduct of its business. We think the article was not libelous per se, and was not actionable unless special damage was alleged and proven. Neither of these requisites was met. In what manner they should be met is clearly stated in the Erick Bowman Company Case.

There was thus no basis for a recovery of either general or special damage, and consequently no foundation for punitive damages. Sedgwick on Damages (8th Ed.) § 361; 17 C. J. p. 974, § 270.

The motion for a directed verdict in favor of defendant should have been sustained. The judgment must be reversed and the cause remanded for further proceedings not inconsistent with the foregoing opinion. It is so ordered.

LEWIS, Circuit Judge (dissenting). The complaint alleges that plaintiff (defendant in error) was on September 1, 1924, and for several years prior thereto had been engaged in business in Jackson County, Missouri, and elsewhere, producing and selling for profit a motor fuel consisting of a mixture of benzol and gasoline under the trade name of Benzo Gas; that it was the only producer, distributor and seller of said mixture, or any mixture of benzol and gasoline as a motor fuel in Kansas City, Missouri, and vicinity; that it had, because of the merits of said mixture and plaintiff's efforts and ability, established a large and profitable business therein, which was then steadily increasing; that on or about September 1, 1924, while plaintiff was so engaged in such business, defendant falsely and maliciously published at Kansas City, Missouri, certain false and libelous printed statements in reference to plaintiff and plaintiff's product, and distributed to numerous users of motor fuel and prospective users thereof printed copies of said libelous publication; that the statements contained in said publication were false and were made for the purpose and with the intent of discouraging users and prospective users of plaintiff's product from purchasing said product and for the purpose of injuring plaintiff in its reputation, which it had acquired by the excellence and good

quality of said product and mixture as a motor fuel. A copy of the alleged libel is attached to the complaint, and the parts thereof relied on as libelous are these:

" * * * A mixture of benzol and gasoline or a mixture of benzol and kerosene oil is not a proper fuel for an automobile, tractor or truck for the reason that when benzol is ignited by the electric spark, it explodes instantaneously. The entire power of the explosion being instantaneous, it is delivered on one spot of all the bearings in the motor and acts the same as if a sledge hammer were taken and a severe blow delivered on one spot at the rate of from twelve hundred to three thousand sledge hammer blows per minute. The result is that the bearings become egg-shaped, resulting in repairs in the form of new bearings. * * *

"Benzol, or a mixture of benzol and gasoline, or a mixture of benzol and kerosene, causes corrosion and pitting of the cylinders and valves, likewise overheats the engine, causing the valves to become exceedingly hot, necessitating frequent grinding of the valves in order to get proper compression due to the corroding and warping. These mixtures, used in cold weather, cause trouble in the gasoline running from the supply tank to the carburetor. Unmixed benzol starts to flake and congeal at 40 temperature, and if mixed with kerosene oil or gasoline, forms flakes in the small delivery pipe to the carburetor, often causing it to plug up. * * *

"No engineer has designed a motor for burning anything other than gasoline. Therefore, why go contrary and use other fuels for which the motor was not designed?

"Dopes advertised to increase the efficiency of gasoline, to prevent the formation of carbon and other claims are nothing but dopes and should not be used. They are harmful to the motor. They do not increase the efficiency of good gasoline, and even when used with mixtures of gasoline and kerosene or low grade gasolines, they are more harmful than the material used. You can take several different acids and introduce them in a motor, and they will eat the surface of the iron until it is clean and bright, but they are destroying the motor."

The pamphlet had a headnote: "This Will Interest You," and was signed: "The National Refining Company. 42 Years' Experience."

Defendant answered, justifying the alleged libel as true in fact. At the close of plaintiff's proof defendant demurred to the evidence as insufficient to make a case, which being overruled, defendant then declined to offer any testimony and the jury took the case on the plaintiff's proof and the court's instructions. Its verdict for plaintiff found that the statements in the pamphlet were false, and that finding is amply supported by the proof. The pamphlet was gotten up by the defendant's president and was circulated by its employés right at plaintiff's filling stations. Plaintiff and defendant had filling stations in Kansas City where they dispensed automobile fuel near each. The defendant sold a gasoline which it manufactured and advertised as White Rose. I think there can be no doubt on the record that the publication was directed at the plaintiff in its business and was intended to injure it in its business.

The principal contention is that the complaint did not state a cause of action because it did not plead special damages nor prove such damages; but there seems to be no doubt that an individual or corporation may be libeled in the way of his or its business and entitled to recover general damages therefor. The question here is whether this is that kind of a case. Newell on Slander and Libel (2d Ed.) says:

"At common law, therefore, an action lies for words which slander a man in his trade, or defame him in an honest calling; as, to say of a merchant or tradesman he is a bankrupt. So to charge a man with deceit in his trade, or other malpractice." Page 68. "Any written words are libelous which impeach the credit of any merchant or trader by imputing to him bankruptcy, insolvency, or even embarrassment, either past, present or future, or which impute to him fraud, or dishonesty or any mean and dishonorable trickery in the conduct of his business, or which in any other manner are prejudicial to him in the way of his employment or trade. 'The law has always been very tender of the reputation of tradesmen, and therefore words spoken of them in the way of their trade will bear an action that will not be actionable in the case of another person.'" Page 74. "Defamatory words falsely spoken of a person, which impute to the party unfitness to perform the duties of an office or employment of profit, or the want of integrity in the discharge of the duties of such an office or employment are actionable in themselves without proof of special damages; and so, too, are defamatory words falsely spoken of a party which prejudice such party in his or her profession or trade. Next to imputations which tend to deprive a

man of his life or liberty, or to exclude him from the comforts of society, may be ranked those which affect him in his office, profession, or means of livelihood. To enumerate the different decisions upon this subject would be tedious, and to reconcile them impossible; yet they seem to yield a general rule sufficiently simple and unembarrassed, namely, that words are actionable which directly tend to the prejudice of any one in his office, profession, trade or business. So, if a person carry on any trade recognized by the law, or be engaged in any lawful employment however humble, an action lies for any words which prejudice him in the way of such trade or employment. But the words must relate to his trade or employment and 'touch' him therein." Page 168. "The rule is well settled in the United States that words spoken of a person in his office, business, or employment, imputing a want of integrity, of credit, of common honesty, are actionable without proof of special damages; * * * and generally it may be said of all persons who carry on any trade recognized by law, or are engaged in any lawful employment, however humble, an action lies for any words falsely and maliciously spoken which prejudice them in any way of such trade or employment, provided the words are spoken of and concerning such trade or employment, and 'touch' them therein." Pages 192, 193. "Defamatory words which impute to a person dishonesty and fraud in the conduct of his trade, such as knowingly selling inferior articles as superior, or wilfully adulterating his wares, will be actionable without proof of special damages. * * * If the words merely impugn the goods the plaintiff sells, they are not actionable unless they fall within the rules relating to slander of title; for they are but an attack on a thing, not a person. But often an attack on a commodity may be also an indirect attack upon its vendor; as if fraud or dishonesty be imputed to him in offering it for sale." Page 195.

To each of those excerpts from Newell a number of American and British cases are cited in support. That is the rule announced in Burnet v. Wells, 12 Mod. 420, and in Larsen v. Brooklyn Daily Eagle, 165 App. Div. 4, 150 N. Y. S. 464, cited in the majority opinion here. The Massachusetts Supreme Judicial Court, in Morasse v. Brochu, 151 Mass. 567, 25 N. E. 74, 8 L. R. A. 524, 21 Am. St. Rep. 474, said:

"Many cases turn upon the question whether words spoken of one who has a particular profession or trade touch him in it;

that is, whether they have such a close reference to such profession or trade that it can be said they are defamatory by means of an imputation upon him in that character."

And in the celebrated English case of Ingram v. Lawson, 6 Bing. N. C. 212, the plaintiff was permitted to recover for libel which consisted of statements that he was about to start on a voyage, carrying freight and passengers, in the vessel Larkins, owned by him, which was unseaworthy and on that account would be overtaken in a calamity. The court sustained the verdict for general damages on the ground that the publication was a libel on the plaintiff in the way of his business. Maule, Erskine, Coltman and Bosanquet all expressed themselves on the point and were in agreement that the imputation on the plaintiff was in his business as a ship owner and master mariner, and not a mere disparagement of the qualities of his ship. It was held in White v. Delavan, 17 Wend. (N. Y.) 49, that a publication charging a malster with using filthy and disgusting water in the malting of grains for brewing is libelous, and that an action therefor would be sustained without showing special damages. Likewise in O. & M. Ry. Co. v. Press Publishing Co. (C. C.) 48 F. 206, Circuit Judge Lacombe held a publication libelous per se, which stated that over half of the ties in the plaintiff's roadbed were rotten and that it was dangerous to run trains over them very fast. Judge Lacombe said that the occupation of the plaintiff required a proper, safe and businesslike maintenance and operation of its railroad and that language which charged it with such incapacity or neglect in the conduct of that business as to induce shippers and passengers to refrain from employing the plaintiff as a common carrier because of their belief in the truthfulness of the false statement, was actionable without proof of special damages.

We approvingly recognized that rule in Victor Safe & Lock Co. v. Deright, 147 F. 211, 8 Ann. Cas. 809, where we said, in reference to the three cases last cited:

"Such language although relating to property or an article produced, is a libel on the owner or producer because it implies that he is guilty of deceit, or what is more reprehensible, in the conduct of his business."

In Moore v. Francis, 121 N. Y. 199, 23 N. E. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810, Justice Andrews, speaking for the court, said:

"Whatever words have a tendency to hurt, or are calculated to prejudice a man

who seeks his livelihood by any trade or business, are actionable. Where proved to have been spoken in relation thereto, the action is supported, and unless the defendant shows a lawful excuse, the plaintiff is entitled to recover without allegation or proof of special damage, because both the falsity of the words and resulting damage are presumed. * * * The word 'libel' as expounded in the cases, is not limited to written or printed words which defame a man, in the ordinary sense, or which impute blame or moral turpitude, or which criticize or censure him. In the case before referred to, words affecting a man injuriously in his trade or occupation, may be libelous, although they convey no imputation upon his character. Words, says Starkie, are libelous if they affect a person in his profession, trade or business, 'by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof.' Starkie, Slander and Libel, § 188. * * * Words, to be actionable on the ground that they affect a man in his trade or occupation, must, as is said, touch him in such trade or occupation; that is, they must be shown, directly or by inference, to have been spoken of him in relation thereto and to be such as would tend to prejudice him therein."

This case was cited with approval by this court in Davis v. Bakewell, 255 F. 960, in which the libel relied on was as to the occupation of plaintiff, and special damages were not plead. We held there was a good cause of action.

Again, in Sternberg Mfg. Co. v. Miller, etc., Co., 170 F. 298, 18 Ann. Cas. 69, we said of the libel:

"It is a charge, too, of that peculiar misconduct which naturally and directly brings down upon the offender's business the disapprobation of the public and necessarily entails injurious consequences. It is, therefore, according to well recognized law, actionable per se [citing cases]. Being so actionable, damages ensued as a necessary consequence; and it was not necessary to plead special damages to constitute a cause of action."

In Pollard v. Lyon, 91 U. S. 225, 227 (23 L. Ed. 308), the Supreme Court said:

"Certain words, all admit, are in themselves actionable, because the natural consequence of what they impute to the party is damage, as * * * if they are prejudicial in a pecuniary sense to a person in office

or to a person engaged as a livelihood in a profession or trade."

See, also, International Text Book Co. v. Leader Printing Co. (C. C.) 189 F. 86.

It seems to me that the controlling inquiry is whether the publication can be reasonably held to have been directed against the plaintiff in the way of its business, rather than only a criticism of Benzo Gas as a thing; and for the purpose of determining that inquiry the facts, which support the allegations of the complaint, show the circumstances under which the publication was made, and to me they seem convincing that it was directed against the plaintiff in the way of its business. Their effect would naturally discourage the purchase and use of plaintiff's product by those into whose hands the pamphlet might come; and the plaintiff was as clearly pointed out under the circumstances as it would have been had it been named therein. The president of the defendant company, who prepared the pamphlet, and its agents who distributed it, were not acting as philanthropists or public benefactors. The plaintiff and defendant were rivals and competitors in the same business. No other inference can be drawn than that an intention to put the plaintiff to a disadvantage in that competition. So far I cannot see that I am not in accord with the majority opinion; and this leads me to say, but with great respect, that the root of the error into which the majority has fallen is the apparent notion that notwithstanding all I have said, still the article must have been of a libelous character per se. It is therein said:

"Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, are entirely distinct questions, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proofs supporting proper allegations in the complaint. Those proofs may consist either of the article itself or of extrinsic evidence."

If it be true, as I think it to be, that the publication was clearly directed against the plaintiff in its business, and thus constituted a cause of action for general damages, then I consider it wholly immaterial whether the publication on its face, considered apart from the circumstances under which it was published, was in and of itself libelous. Again Newell, at page 181, says:

"When language is used concerning a person or his affairs which from its nature necessarily must, or presumably will as its

natural and proximate consequence, occasion him pecuniary loss, its publication prima facie constitutes a cause of action and prima facie constitutes a wrong without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the terms 'actionable per se,' etc. Therefore the real practical test by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation is whether the language is such as necessarily must or naturally and presumably will occasion pecuniary damage to the person of whom it is spoken."

He then proceeds with a discussion of what constitutes defamation to one in his profession or business.

I am, therefore, led with some regret, to record my dissent. I think the judgment should be affirmed.