**OLIN INDUSTRIES, Inc., Plaintiff,**

v.

**Erich KLEBE, Defendant.**

**Civ. A. No. 4818.**

United States District Court
D. Minnesota, Fourth Division.

May 5, 1955.

Montreville J. Brown and John G. Robertson, of Oppenheimer, Hodgson, Brown, Baer & Wolff, St. Paul, Minn. (Pennie, Edmonds, Morton, Barrows & Taylor and Daniel V. Mahoney, New York City, of counsel), appeared in behalf of plaintiff in support of said motion.

Melvin H. Siegel, of Leonard, Street & Deinard, Minneapolis, Minn., appeared in behalf of defendant in opposition thereto.

NORDBYE, Chief Judge.

Plaintiff has been engaged for many years in the manufacture and sale of small arms and small arms ammunition and is the manufacturer of the well-known Winchester rifles and shotguns. Since 1912, it has manufactured the shotgun which is commonly referred to as the Winchester Model 12 Repeating Shotgun. The gun has had wide distribution and it may be stated that it has been generally and favorably accepted by the public for use in all types of shooting for which shotguns are adapted.

Defendant is a gunsmith and under a patent issued to him on February 21, 1950, manufactures a trigger mechanism designated in the patent as an "Automatic Safety Firing Control for Repeating Shotguns." Apparently the mechanism is designed especially for use on a Winchester Model 12 repeating shotgun and is to prevent the gun from firing if the trigger is held back during reloading; that is, if the user fails to release the trigger of the shotgun after firing and, with the trigger depressed, manipulates the pump action to eject the empty shell and then reloads the gun, the gun will be fired automatically after the shell to be reloaded is completely chambered.

In offering his attachment to the public, defendant has used various types of advertising. In the advertisement appearing in the December, 1953, issue of a magazine entitled the "American Rifleman", he states, "Make Your New or Old Winchester Shotgun Model 12, in All Gauges a Safe Repeater." The words "Winchester Shotgun" and "Safe Repeater" are displayed in a larger type than the remainder of the advertisement, which reads, "With Klebe's Automatic Safety Firing Control (Patented). Prevents accidental firing." This form of advertising, according to defendant, was published only once and then abandoned. And it is fair to assume that this type of non-explanatory advertising will not be resorted to by the defendant again. Obviously, he must inform the reader what the safety device is in some detail or the advertising would be utterly non-productive. The other advertising referred to in the complaint consists of a circular addressed by the defendant to dealers, such as sporting goods stores, etc., which requests the store owner to pass on to his customers the card enclosed with the circular. Defendant sets forth in the circular that the card explains how to make any Winchester Model 12 into a safe repeater. The following appears on the card:

"Safety First
Make Your New and Old
Winchester Shotgun
Model 12 (In All Gauges)
into a safe repeater

With Klebe's (Patented) Automatic
Safety Firing Control which
Prevents Accidental Firing
Read Other Side for Particulars"

The reverse side of the card reads:

"How to Make Your Winchester
Model 12 Shotgun Safe

Every factory made Winchester
Model 12 Pump in all gauges (12,
16, and 20) will keep firing continu-
ously like an automatic after every
shot by simply holding back the trig-
ger and repeating the gun. This
imperfection causes accidents which
jeopardize the life of every hunter
and trapshooter. With Klebe's pat-
ented Firing Control your Winches-
ter is positively made safe. If after
any shot you accidentally hold the
trigger back and repeat the gun, it
will not fire until the trigger has
been released and pulled again.
* * *"

The above also was inserted as an adver-
tisement in a magazine entitled the
"Sportsmen's News".

It is conceded that the construction of
plaintiff's shotgun is such that, if the
trigger is held back after firing and
during the reloading by the pump action,
the gun will fire automatically if the shell
is injected into the gun barrel. Defend-
ant contends that experience has demon-
strated that, in the handling of such a
gun, especially during the excitement of
hunting, a novice or even an experienced
hunter may unwittingly keep his finger
on the trigger during reloading and thus
cause the gun to be discharged unexpect-
edly. On the other hand, plaintiff con-
tends that it is instinctive to release the
trigger after firing and that to assert or
imply that a gun is unsafe under what
may be termed abnormal or unusual han-
dling, is definitely misleading.

No doubt to state that any gun is dan-
gerous and a potential hazard is to utter
a mere truism. Moreover, any gun will
discharge unexpectedly if the user care-
lessly pulls the trigger with the required
force. Certainly, it is well known that
guns often are discharged accidentally
when the user, through excitement or
inexperience, unintentionally presses the
trigger. However, no one would contend
for that reason that the gun may be
termed unsafe. Granted that the type
of defendant's headline advertising im-
plies that the Winchester gun is not a
safe repeater and that therefore it wrong-
fully disparages plaintiff's product, the
query is, Does the advertising, when con-
sidered as a whole, reflect upon the hon-
esty of the plaintiff, or does it charge
plaintiff with fraud, deceit or reprehen-
sible conduct so that the statement is
libelous per se? Plaintiff does not plead
any special damages; thus, if the adver-
tising is not libelous per se, no injunction
should issue and plaintiff should be re-
mitted to an action for damages.

At the outset, consideration should be
given to the usual and probable type of
readers to whom the advertising referred
to would appeal. It may be stated that,
generally speaking, they are a limited and
informed group; that is, persons who
read gun advertisements usually are in-
terested in guns. It seems reasonably
clear that neither prospective purchasers
of shotguns nor owners of shotguns
merely would scan the headlines and con-
clude therefrom that a Winchester gun
is unsafe if properly used. The natural
reaction to the reading of the bold type
headlines would be for the reader to fol-
low through the advertisement and to
read the small print as well. Any head-
line in an advertisement which refers to
guns and suggests that the body of the
advertisement pertains to safety devices
for firearms normally would urge the
reader to peruse the entire advertisement.
Therefore, it seems reasonable to con-
clude that it would be highly improbable
that any prospective purchaser or user
of a shotgun would draw any adverse con-
clusions regarding Winchester shotguns
from a mere scanning of the bold type of
the advertising as to which complaint
herein is mainly directed. A reading of
the full statement contained in the adver-
tising will indicate that the alleged un-
safety of the Winchester shotgun refers
exclusively to the automatic firing on re-

loading if the trigger continues to be depressed, as to which there is no dispute. Whether the action of the Winchester shotgun in firing automatically upon reloading if the trigger is continuously pressed down may be considered hazardous or whether it may contribute to the causing of accidents is a matter as to which there may be differences of opinion. On this showing, at least, I cannot say that defendant's affidavits in regard to potential accidents which may occur in the use of a Winchester Model 12 shotgun under certain circumstances should be disregarded as being frivolous and without any foundation. Moreover, I cannot find on this showing that a fair construction of the entire text of the advertising promulgated by defendant "imputes to the corporation, fraud, deceit, dishonesty, or reprehensible conduct * * *." National Refining Co. v. Benzo Gas Motor Fuel Co., 8 Cir., 20 F.2d 763, 771, 55 A.L.R. 406. The situation presented is somewhat analogous to the use of a safety mechanism on firearms. It is well-known that the early models of shotguns, for instance, were not equipped with any safety devices; that is, there was no device to be manipulated or adjusted so that the gun could be placed on safe. Such guns were safe if handled properly, but a safety device probably would render the gun safer in the hands of the average user. To state that the attachment of such a safety device would make a gun safe or safer in the use thereof would be within the ambit of a reasonable expression of opinion.

True, the language in the advertising must be given its ordinary meaning. But the entire text must be considered, and words or phrases should not be selected and construed away from their context. The word "safe" in general use has a relative meaning. What one person may consider safe, another person may consider unsafe. It may be safe to fire a gun in the country, but unsafe to do so in the city. One may drive an automobile at a given speed and under certain circumstances that speed is safe. However, the same speed under other circumstances may be characterized as unsafe. Some people consider it unsafe to drive an automobile without chains on a snowy or icy road. Others may be of the opinion that chains merely increase the hazard of skidding under such conditions.

It is not denied that the Winchester Model 12 is a safe gun when used as directed. But, on the other hand, an inept or excited user may not use the gun as directed and thereby at times render it unsafe. And if defendant's attachment tends to obviate accidental discharges of the gun in the hands of inexperienced users, it must be recognized that some people may opine that a safety factor is added thereby. Defendant's advertising would be more accurate and less misleading if he designated his device as a safety factor for Winchester guns, or even if he stated that, under certain circumstances, it makes Winchester guns safer. But even though one concludes that the headlines of the type of advertising used may be misleading and even ill-advised, I cannot find on this showing that the advertising considered as a whole disparages plaintiff's product so that the text is libelous per se and justifies the issuance of a temporary injunction.

In view of the premises, it is not necessary for the Court to pass upon the defendant's contention that injunctive relief cannot be issued against trade libels or disparagement in absence of an independent ground for equitable relief. See note 148 A.L.R. 853.

It follows from the foregoing that plaintiff's motion for a temporary injunction must be, and the same hereby is, denied. It is so ordered.

The temporary restraining order issued under date of March 1, 1954, and continued under date of March 4, 1954, is hereby dissolved. It is so ordered.

An exception is allowed.